## WIGHT VS. RINDSKOPF.

CONTRACTS. *(1) If against public policy, never enforced. (6, 7) The case stated; contract held void.*

EVIDENCE: ACCOMPLICE. *(2) Admissibility of accomplice on promise of pardon rests with court. (3) Effect of admitting accomplice, as to other indictments. (4) Agreement for immunity by public prosecutor, when void. (5) Witness, as such, not entitled to attorney.*

REVERSAL OF JUDGMENT. *(8) When cause remanded for new trial.*

1. Courts will always refuse to enforce contracts which are contrary to public morality or policy, whenever and however, in actions upon them, that fact may be made to appear.

2. The admission of an accomplice as a witness for the government upon implied promise of pardon, in any case, is not at the pleasure of the public prosecutor, but rests in the sound judicial discretion of the court.

3. If an accomplice in one crime be also indicted for another, and the fact be within the knowledge of the court, he will not, in general, be admitted as a witness; but if admitted, though he testify in good faith against his accomplices upon one indictment, he will be put upon his trial on the other, and punished upon conviction.

4. An agreement of the public prosecutor, unsanctioned by the court (if such sanction could be given in such a case), for immunity or clemency to several defendants, in several indictments, upon *one of them* becoming a witness for the prosecution upon still other indictments, would be a fraud upon the court, and an obstruction of public justice.

5. A witness, as such, cannot have an attorney; and though an accomplice may act by advice of his attorney on the question whether he will become a witness for the prosecution, when he once becomes such a witness, the relation of attorney and client ceases *quoad hoc.*

6. The federal statute which authorizes the commissioner of internal revenue, with the consent of the secretary of the treasury, to compromise any civil *or criminal* case under the internal revenue laws, instead of commencing suit thereon, and, with like consent, and on the recommendation of the attorney general, to compromise any such case after suit commenced thereon (R. S. of U. S., § 3229), being, in the judgment of this court, essentially immoral, so far as it authorizes a compounding of crimes, any collateral contract, looking towards, in aid of, or subordinate to, such an agreement to compound a crime, under that statute, will not be enforced in the courts of this state.

7. While several indictments were pending in a federal court against defendant and six other persons for violation of the revenue laws, plaintiff told

defendant that his relations with the prosecuting attorneys were such that he thought he could render these parties essential service. Thereupon it was agreed between defendant and plaintiff that the former should give evidence for the United States, under the counsel and direction of the latter, against persons, other than those included in the agreement, against whom still other indictments for violations of the revenue laws were pending in the same court; and plaintiff undertook that defendant and the other six persons above mentioned should be permitted severally to plead guilty to those counts only, in the several indictments against them, involving the least punishment, and receive upon those the lowest punishment of the law; and for this service, if successful, defendant was to pay plaintiff a large sum for each person mentioned. The agreement required no disclosure, evidence or other aid to the government from any other person than defendant, and did not require him to make full disclosure to the prosecuting attorneys, or to put himself in their hands as their witness. *Held*, that the services on plaintiff's part thus stipulated for were not within the legitimate scope of a professional retainer of an attorney-at-law, and a contract therefor is void as against public morality and policy.

8. The complaint in this action being general for professional service, and it not appearing that plaintiff may not be able to give evidence under it of legitimate professional service, the cause, on reversal of a judgment in his favor based upon evidence of such agreement, is sent back for a new trial.

APPEAL from the County Court of *Milwaukee* County.

The complaint alleges that plaintiff is an attorney-at-law, and that defendant is indebted to him for a balance of $2,000, on account of legal services rendered defendant " and divers other persons, upon the retention of the defendant, on account of and as per agreement with said defendant;" that defendant made an agreement with plaintiff, whereby the former " retained and agreed to pay plaintiff the sum of $3,000, upon condition that said plaintiff should be retained and render certain legal and professional services for defendant and certain other parties named by defendant; " and that plaintiff performed the services as agreed, and had been paid $1,000 on account. The contract sued upon is not otherwise stated in the complaint.

The answer admits the services rendered according to agree-

ment, but alleges that the sum of $1,000 was agreed upon as full payment, which sum has been paid.

The nature and terms of the agreement proven upon the trial, as understood by the court, are stated in the opinion. A motion by defendant, at the close of the evidence, that plaintiff be nonsuited, was denied. Verdict and judgment for plaintiff, and, a motion for a new trial having been denied, defendant appealed.

Briefs were filed, by *Cottrill & Cary*, for the appellant, and by *Jenkins, Elliott & Winkler*, contra; and there was oral argument by *Mr. Cottrill* and *Mr. Winkler*.

For the appellant it was argued, that the services' proven were in no sense legal services. Plaintiff was not to appear as counsel in court, nor did he so appear. He was merely using his relations with the government counsel to trade off the testimony of the defendant for a *nolle prosequi* as to himself and two of the others, and for a minimum punishment for each of the others indicted. Nor does it appear that the court was advised of these negotiations and promises, or that they were made with its sanction and approval. All that appears is, that ultimately, and presumably, perhaps, on the recommendation of counsel for the government, sentences passed and dispositions of the cases were made "as per agreement," as plaintiff states it. In cases affecting the public, the prosecutors have no right to forgive the injury; and it is illegal to receive, or to stipulate to receive, a consideration for suppressing a prosecution, or compromising it, without the sanction of the court. 1 Chitty's Cr. Law, 3, 4. And contracts to conceal or compound criminal acts, or to suppress evidence in a criminal prosecution, are void. 1 Story on Con. (5th ed.), § 700, and cases there cited. The following English cases are in point: *Collins v. Blantern*, 2 Wilson, 347; *Norman v. Cole*, 3 Esp., 253; *Edgcombe v. Rodd*, 5 East, 294; *The King v. Southerton*, 6 id., 126; *Nerot v. Wallace*, 3 Durnf. & East, 17; *Wallace v. Hardacre*, 1 Campb., 45; *Clubb v.*

*Hutson*, 18 C. B., N. S., 414. Among the American authorities are: *Shaw v. Reed*, 30 Me., 105; *Burley v. Burley*, 6 N. H., 200; *Bills v. Comstock*, 12 Met., 468; *Jones v. Rice*, 18 Pick., 440; *Mattock v. Owen*, 5 Vt., 42; *Roll v. Roquet*, 7 Ohio, 76; *Martin v. Wade*, 37 Cal., 168; *Devlin v. Brady*, 36 N. Y., 531; *Tool Company v. Norris*, 2 Wall., 45; *Trist v. Child*, 21 id., 441; *Hatzfield v. Gulden*, 7 Watts, 152; *Kribben v. Haycraft*, 26 Mo., 396; *Bryan v. Reynolds*, 5 Wis., 200; *Morse v. Ryan*, 26 id., 356.

For the respondent it was argued, that no agreement is void as against public policy unless injurious to the interests of the state. All that the cases cited by counsel for appellant establish is, that when an act is of such a nature that a payment to the person by whom it is to be done would be at variance with good morals and the best interests of society, a promise to pay another for inducing him to do it by secret and undue solicitation, as distinguished from fair and open advocacy, will be deemed contrary to public policy, as giving occasion for fraud and corruption. This contract does not come within the principle of the cases cited. There the contract was not for professional services, but for the use of personal and sinister influences, to suppress prosecution, or to compound a criminal act, or to interfere with the course of justice. This contract was in aid of criminal prosecution, and in furtherance of justice. It brought to the government evidence not before attainable. It aided public prosecution for crime. Courts have not only enforced such contracts, but they have not permitted prosecutions to proceed against one who has been a witness for the government under promise of absolute or partial immunity. *People v. Whipple*, 9 Cow., 717; *People v. Lohman*, 2 Barb., 223; *United States v. Lee*, 4 McLean, 103. 2. The sole issue raised by the answer is as to the amount of compensation contracted to be paid. No question of the legality of the contract was suggested by the pleading. Illegality must be specially pleaded. *Taylor v.*

*King*, 6 Munf., 358; *Chew v. Moffett*, id., 120; *Huston v. Williams*, 3 Blackf., 170; *U. S. v. Sawyer*, 1 Gall., 87; *Gregory v. Hart*, 7 Wis., 532; *Gill v. Rice*, 13 id., 549; *Martin v. Pugh*, 23 id., 184.

RYAN, C. J. The learned counsel for the respondent contended that the question of the invalidity of the contract, as against public policy, relied on by the appellant, is not in the case, because the answer does not raise it. And he cited some cases here and elsewhere, to sustain the position. But we do not think that they do so. They recognize the general doctrine, that when a contract, valid on its face, is impeached for fraud, the extrinsic facts going to the consideration only, must be specially pleaded. They do not hold, we know of no case which does, that when a contract is in terms *contra bonos mores*, it is necessary for the defendant to plead the objection; or that a court will proceed to judgment upon it, both parties even assenting. If the objection be not made by the party charged, it is the duty of the court to make it on its own behalf. Courts owe it to public justice and to their own integrity, to refuse to become parties to contracts essentially violating morality or public policy, by entertaining actions upon them. It is judicial duty always to turn a suitor upon such a contract out of court, whenever and however the character of the contract is made to appear.

In the present case, the nature of the contract does not appear either in the complaint or in the answer. The pleadings of both parties appear to acquiesce in its validity. But if the contract, as proved, be essentially against public policy, it was the duty of the court below promptly to exclude it and all evidence under it, from the consideration of the jury. The acquiescence of the defendant could not purge it, or afford excuse to the court to enforce it. And the question here is, the nature of the contract itself.

It appears to have been early held by a great authority, that

an accomplice with promise of pardon for his evidence, is not a competent witness against his codefendants in an indictment. Says Sir Matthew Hale: "If a reward be promised to a person for giving his evidence before he gives it, this, if proved, disables his testimony. And so for my own part I have always thought, that if a person have a promise of pardon if he gives evidence against one of his own confederates, this disables his testimony if it be proved upon him." 2 P. C., 280. But a contrary practice has long prevailed, by unanimous consent of all courts, English and American. "The admission of accomplices, as witnesses for the government, is justified by the necessity of the case, it being often impossible to bring the principal offenders to justice without them." 1 Greenleaf's Ev., § 379. But this use of an accomplice, upon implied promise of pardon, is not at the pleasure of the public prosecutor, but rests in the sound judicial discretion of the court. A justice of the peace, before whom prisoners are brought for examination, cannot exercise such a discretion, to bind the court in which the prisoners are indicted and tried; and the judges of the court itself cannot exercise it, to bind the pardoning power; though in the latter case, if the accomplice make full disclosure in good faith upon the trial, the implied promise of pardon is respected. And it is not matter of course for the court to admit the accomplice as a witness; application for the purpose must always be made to the court, which admits or refuses to admit him, in view of the particular circumstances of the case. *Rex v. Rudd*, 1 Leach C. C., 115; 1 Cowper, 332; 1 Waterman's Archbold, 376; 3 Russell on Crimes, 596; 1 Edwards' Phillipps' Ev., 108; Sharswood's Roscoe's Crim. Ev., 127; *People v. Whipple*, 9 Cow., 707. And if the accomplice, being admitted as a witness, fail to testify to the whole truth in good faith, the implied promise of pardon is revoked, and the accomplice tried and punished for his own crime. *Rex v. Rudd, supra;* *Moore's Case*, 2 Lewin, 37; *Rex v. Brunton*, Rus. & Ry.,

454. If an accomplice in one crime be also indicted for another, and the fact be within the knowledge of the court, the accomplice will not, in general, be admitted as a witness. *Anon.*, 2 Car. & P., 411. The reason of this rule is not given. It may be because the accomplice might be misled by expectation of general pardon, or because one indicted for several crimes ought not to be admitted as a witness to any of them, or perhaps for both reasons. But if he be so admitted, though he testify in good faith against his accomplice upon one indictment, he will nevertheless be put upon his trial on the other, and punished upon conviction. *Rex v. Lee*, Rus. & Ry., 361; *Rex v. Brunton*, id., 454.

So it is seen that courts jealously reserve to themselves, and cautiously exercise, the discretion to admit accomplices as witnesses, upon implied promise of pardon; and that a public prosecutor has no authority to make any such agreement with a defendant in an indictment. It is for the court alone to countenance the escape of an accomplice from punishment, for giving evidence against those indicted with him. In a proper case, it is doubtless the duty of a public prosecutor to move for leave to use the accomplice as a witness. But there his discretion stops. And though courts must necessarily trust largely, in such cases, to the view of the public prosecutor, yet they do not lightly give leave; and are always presumed to exercise their own judgment in view of all the circumstances. A public prosecutor may propose to an accomplice to become a witness for the prosecution; but an agreement to use him as a witness, upon any condition, without the sanction of the court, is a usurpation of authority, an abuse of official character and a fraud upon the court.

In this state of the law, we are not prepared to say that the attorney or counsel of one indicted with others, might not render proper professional service for his client, in negotiating with the prosecuting officer for his admission as a witness against his accomplices, under an implied promise of pardon.

We are, however, far from being clear, that such an interference with the duties of the public prosecutor would be within the legitimate scope of professional retainer.

But such was not the nature of the respondent's retainer here. There appear to have been many indictments pending in the federal court, for violations of the federal revenue law. Amongst these, there appear to have been indictments severally found and pending, against the appellant, his four brothers, his brother-in-law, and a servant of some of them. The respondent told the appellant that his relations with the prosecuting attorneys were such, that he thought he could render these parties essential service.

It does not appear whether the relations thus suggested were personal or professional; and it is immaterial. No relation of any public officer, charged with any function in the administration of justice, can be tolerated in any influence upon its course. Corruption is a hard word, not always accurately understood; covering a multitude of official delinquencies, great and little. But it is strictly accurate to apply it to any color of influence, of mere relation of any kind, on the administration of justice.

The appellant appears not to have trusted to the respondent's suggestion of his relations with the prosecuting officers, but to have verified them himself. Thereupon it was agreed between the appellant and the respondent, that the former should give evidence for the United States, under the counsel and direction of the latter, presumably against parties indicted under the revenue law, other than those included in the agreement; that the respondent thereupon undertoook that the appellant and the other parties mentioned, should be permitted severally to plead guilty to those counts only in the several indictments against them, involving the least punishment, and receive upon those the lowest punishment of the law; and that for this service, if successful, the appellant should pay to the respondent a large sum for each person

mentioned, or if unsuccessful, nothing. This was the whole agreement. It provided for no disclosure, no evidence, no aid in any shape to the United States, of any of the parties included in the agreement, other than the appellant. The appellant's evidence for the United States on indictments against other persons, was the only condition of the clemency which the respondent agreed to secure for the seven parties named.

It is important to notice that the agreement almost necessarily presumes each of the parties for whose benefit it was made, to be not only liable to conviction on the indictment against him, but likely to receive a higher degree of punishment than that limited by the agreement.

It is also to be noticed that, while one only of the persons for whom the agreement stipulates to secure clemency, was to be a witness for the United States, even he was not bound to make full disclosure to the prosecuting attorneys, or to put himself in their hands, as their witness; but was only to testify as he might be advised and directed by his own attorney. We cannot believe that any court ever accepted, ever could accept, an accomplice as a witness, upon an implied promise of pardon, on such terms. Indeed no court could decently accept any witness, in any cause, to testify, not as the court should direct, but as he should be advised and directed by his own attorney. A witness, as a witness, cannot have an attorney. It is the duty of the court in which he testifies to advise him of his rights as a witness, to protect him against improper inquiries, and to enforce his answer to proper inquiries. An accomplice may act by the advice and direction of his attorney, in his defense upon the indictment against him; he may act by advice and direction of his attorney on the question whether he will become a witness; but when he once becomes a witness for the prosecution, the relation of attorney and client ceases *quoad hoc*. No professional advice can limit his testimony or prompt it or guide it. No advice bearing on his

testimony is proper to be given, or within the scope of professional duty to give.

The respondent testified that he fully and effectually performed the agreement on his part, in all its details and as to all of the parties.

Had all these parties been indicted together, no case in the books, no principle in the law, would sanction any advantage to the accomplice becoming a witness for the prosecution, except the implied promise of pardon to himself; would sanction any immunity or clemency, in consideration of his giving evidence, to any other persons indicted with him. Any agreement of a public prosecutor with an accomplice becoming a witness, for any advantage to the accomplice beyond his immunity upon the indictment upon which he testifies, or for immunity or clemency to other persons indicted with him, on the same or any other indictment, would not only be beyond the official authority of a public prosecutor, but would be an obstruction of the administration of public justice which no court could sanction or countenance. When indictments are several, for several offenses, we know of no practice, of no case in the books, to sanction or countenance any suggestion of the public prosecutor for immunity or clemency to the defendant on one indictment, on condition of his giving evidence for the prosecution on others; far less for immunity or clemency to several defendants, in several indictments, upon one of them becoming a witness for the prosecution upon still other indictments. We are not prepared absolutely to say that there might not be extraordinary circumstances in which judicial sanction might be given to an understanding with the defendant in several indictments, becoming a witness for the prosecution on one, with promise of pardon on all; in order to secure conviction for great crime, by suffering less crime to go unpunished. We are strongly inclined to think, however, that any such agreement should be regarded as working corruption in the administration of public justice, beyond justification by any

exigency.   But if any sanction could be given to such an understanding, it could be given only by the court in which the indictments are pending, upon fullest and most explicit knowledge of the understanding and of the circumstances leading to it.   Any such agreement of a public prosecutor with a person under indictment, unsanctioned by the court, would be a fraud upon the court and an obstruction of public justice.   A public prosecutor making it would be unworthy of his office and of his profession.

A public prosecutor is a *quasi* judicial officer, retained by the public for the prosecution of persons accused of crime, in the exercise of a sound discretion to distinguish between the guilty and the innocent, between the certainly and the doubtfully guilty; never voluntarily to acquiesce in an acquittal upon certain presumption of guilt, or in conviction upon doubtful presumption of guilt.   So, in suggesting to the court the use of an accomplice as a witness for the prosecution, he acts upon his own view of the necessity and of the comparative guilt of the persons indicted; and the court will generally pay great respect to his opinion.   He is trusted with broad official discretion, generally subject, however, to judicial control.   And if, in the exercise of his discretion, a public prosecutor has none to make an agreement of the character in question, it is surely not within the legitimate scope of private professional retainer, to induce him, by personal influence or persuasion or otherwise, to abuse and indeed to exceed his discretion, to violate his duty, and to obstruct the administration of public justice which it is his office to promote.

Any agreement of the character here in question, unsanctioned by the court in which the indictments are pending, between a public prosecutor and the attorney of the defendant in an indictment, is an assumption of judicial function, a bargain for judicial action and judgment; hardly, if at all, distinguishable in principle from a direct sale of justice.   Without the sanction of the court, it is difficult to understand how

such an agreement could be kept. For while the court is not privy to the bargain, the fulfillment of it largely depends upon the court. Such a bargain, unsanctioned by the court, could not be kept by any proper exercise of proper professional function, in any court not willing largely to abdicate its proper functions in favor of its officers.

It appears by the evidence below, that the judgments of the federal court on the indictments were such as, in fact, to fulfill the respondent's agreement. How that came about does not appear. But because it was in fact brought about, the learned counsel for the respondent contended that we must assume that the federal court was privy to the agreement and sanctioned it. In the absence of all evidence on the point, we are not at liberty to come to any such conclusion. We have too high a respect for the eminent judges of that court. We cannot believe that they would lend any sanction to such an agreement. But even if unhappily the record disclosed that they did, we might deplore the fact, but could not permit it to influence us. Such a sanction in another jurisdiction could not change the rule of public morality or public policy in this jurisdiction. No judicial sanction elsewhere could control the rule here; or justify courts here in upholding contracts against the public morality or public policy of this state. In such a case, the validity of the contract is determined by the *lex fori*. Story's Conflict, § 244.

Agreements tending to obstruct the administration of justice in far less degree have been always, by all courts, everywhere, held void in law. We do not, however, hold this agreement void upon the special authority of any case or class of cases, but upon principles running through all the cases and of higher obligation than any. We might cite many; but we could not bend down this court to the sanction of such an agreement, if there were not a precedent in the books to sustain us.

If a professional retainer so to influence a public prosecutor

could be sanctioned, we see no reason why a retainer might not be upheld so to influence an attorney or counsel in the direction of his private client's interest; nay, so to influence a jury in the box or a judge upon the bench. All such things are not mere violations of professional ethics; they are out-side of professional function.

The profession of the law is not one of indirection, circum-vention or intrigue. It is the function of the profession to promote, not to obstruct, the administration of justice. In litigation, a lawyer becomes the *alter ego* of his client; and professional retainer rests in absolute and sacred confidence. But the duty imposed by professional retainer is direct and open. Professional function is exercised in the sight of the world. Professional learning and skill are the only true pro-fessional strength. Forensic ability is the only true profes-sional influence on the course of justice. Private preparation goes to this, only as sharpening the sword goes to battle. Professional weapons are wielded only in open contest. No weapon is professional which strikes in the dark. The work of the profession is essentially open, because it is essentially moral. No retainer in wrong is professional. A lawyer may devote himself professionally to the legitimate business of his client; but he cannot be retained in whatever may not be rightfully and lawfully done. He may defend a wrong done in the past, but he cannot be privy to the doing of a wrong in the present. The profession is not sinless, but its sins are all unprofessional. When a member of the bar is privy to the wrong-doing of his client, he is his client's accomplice, not his lawyer. In courts or other casual tribunals, before the great tribunal of public opinion, a lawyer may openly, upon open retainer, advocate his client's cause, however bad, and be within the function of his profession. But a lawyer who oth-erwise uses personal or professional influence to bend justice in favor of his client; who uses any influence for his client upon the administration of justice, except open professional

service and advocacy; who seeks by device or intrigue advantage for his client in litigation; is outside of professional duty and function; is acting in his personal and not in his professional capacity. Justice will always bear litigation; litigation is, in practice, presumed to be the safest test of justice. And the administration of justice is promoted, not obstructed, by direct, open, professional advocacy. But it may well be obstructed by private influence. It is therefore the duty of all courts, upon all proper occasions, to see that the profession is confined to professional service, by professional means; and to lend no sanction to unprofessional service, or unprofessional retainer; no sanction to influence on the course of justice *per ambages*. And, if there were no other objection to this agreement, we should hold it outside of the scope of professional employment, outside of the professional right of a lawyer; and service under it, not professional — not calling for professional compensation.

We could not falter in the recognition or application of the principles underlying this judgment, without violating our duty and prevaricating with God and our consciences. But we apply them to the present case with peculiar pain. We impute no conscious *mala fides* to the distinguished gentleman who is respondent here. The profession is too comprehensive and difficult for a safe short cut, even to precise appreciation of its duties and scope, even by persons of the most eminent abilities and general accomplishments. We attribute the respondent's misconception of professional function to want of professional training and experience. And the record tends to show special excuse for the respondent in the misconception.

If the complaint had set out the agreement and gone only upon it, we should direct its dismissal. It does not, however, but is general for professional service. We therefore cannot assume that the respondent may not be able to give evidence under it of legitimate and meritorious professional service. We shall therefore send the case down for retrial.

*By the Court.* — The judgment is reversed, and the cause remanded to the court below for a new trial.

The respondent moved for a rehearing, chiefly on the following grounds: 1. That a prosecutor in the federal courts has authority to make an agreement with a defendant in an indictment to admit him as a witness upon promise of pardon. 1 Bish. Cr. Pro., 1076.   2. That this court erred in assuming, against legal presumption *(Tomie v. Thompson,* 3 Cranch C. C., 123), and without sufficient affirmative evidence, that immunity or mitigation of punishment was promised to others on account of appellant's testimony, and not on account of their own.   3. That in the courts of the United States, where common-law offenses are unknown, the commissioner of internal revenue, attorney general, and secretary of the treasury, have authority, in *quasi* criminal trials for violation of the federal laws, to order a compromise, discontinuance or *nolle prosequi* (R. S. of U. S., §§ 3229–31); and that in such a case this court ought not to apply the *lex fori,* against the comity that is extended even to courts of foreign countries, and in violation of the maxim, applied to judicial procedure, " *Omnia præsumuntur rite esse acta.*"   4. That the respondent would be able, on a rehearing, to explain the testimony commented upon in the foregoing opinion, so as to show that his professional employment and services were in furtherance of and not against public policy.   In this connection the respondent insisted, that it would appear from all the evidence, that his " social, personal and friendly relations with the prosecuting attorneys" had merely brought to his knowledge the fact that the government was in need of " evidence on certain points which it was difficult to obtain;" that by means of the knowledge thus lawfully gained, and not by the exercise of corrupting influence, he was in a position to render a special service to the appellant and his family; that appellant's agreement to give testimony for the government under respondent's counsel and direction, did

not mean that he was to testify much or little, fairly or eva-
sively, as respondent should dictate, but the evidence shows
that his agreement was, " to give testimony — telling the truth,
the whole truth and nothing but the truth — for the govern-
ment, when it asked him to testify in any of its cases;" and
that the evidence further shows that respondent's services con-
sisted in advising appellant to accept terms proffered by the
government, in directing him so as to shield him from the in-
fluence of his accomplices, in making for him his agreement
with the government so explicit as not to involve dispute about
its terms, in constantly impressing upon his mind the necessity
of keeping full faith with the government, in claiming from
the government for the appellant and those whom he repre-
sented, entire fulfillment of the agreement, and finally in mak-
ing to the court an argument in favor of the appellant and
others — all of which services were properly professional.

Ryan, C. J. It appears that this appeal was decided in ig-
norance of a federal statute, which has been now first called to
the attention of the court, and which, it is claimed, should
govern this appeal in favor of the respondent.

This statute authorizes the commissioner of internal reve-
nue, with the assent of the secretary of the treasury, to com-
promise any civil or criminal case under the internal revenue
law, before judicial proceedings taken; and, with like consent
and on the recommendation of the attorney general, to com-
promise any such case, after judicial proceedings taken. U.
S. R. S., § 3229.

To appreciate the character of this provision, some refer-
ence to a few of the other provisions of the internal revenue
law is necessary.

Sec. 3167 punishes by fine or imprisonment or both, dis-
missal from office and incapacity to hold office, specified vio-
lations of duty by revenue officers. Sec. 3169 punishes by
fine and imprisonment, specified violations of duty by revenue

Wight vs. Rindskopf.

officers, including extortion, conspiracy, fraud, bribery, false entries and returns, etc. Sec. 3170 punishes by fine and imprisonment, compounding violations of the law, by certain unauthorized officers. Sec. 3179 punishes by fine or imprisonment or both, the return to certain revenue officers of false lists, accounts or statements, many of which are required to be made under oath by secs. 3307, 3338, 3358, 3387, 3390, 3414; such false oaths being made perjury, punishable by fine and imprisonment and incompetency to give testimony, by sec. 5392. Sec. 3305 punishes by fine and imprisonment and forfeiture of realty and personalty, the making of false entries in books of distillers. Sec. 3306 punishes by fine and imprisonment, the use of false weights and measures. Sec. 3326 punishes by fine and imprisonment, alterations of revenue stamps, marks and brands. Sec. 3342 punishes by fine and imprisonment the use of forged revenue stamps. Sec. 3346 punishes by imprisonment the making, selling or using, of counterfeit revenue stamps and permits, and dies for making them. Sec. 3375 declares the use of forged or canceled revenue stamps felony, punishable by fine and imprisonment. Sec. 3423 punishes by fine or imprisonment or both, forgery, larceny or embezzlement of revenue stamps. Sec. 3429 punishes by fine and imprisonment, forgery of revenue stamps, dies, plates, etc., and effacing the cancellation of revenue stamps. Sec. 3451 punishes by imprisonment, forgery of bonds, permits, entries or other documents under the law.

It is not for us to criticise any disregard or confusion of the distinction between civil and criminal processes, or of the essential distinction between misdemeanor and felony, or of the degrees of moral turpitude, which may be found in these provisions. But it is our duty to notice that the statute, upon which this motion is chiefly founded, expressly authorizes the compounding of misdemeanors of a purely public character, of crimes ranking as felony at the common law, and of crimes made felony by the statute itself.

Pending this motion, besides the argument of the respondent, we received a paper signed by two distinguished members of this bar, criticising the opinion delivered on the appeal. In this paper, a regret seems to be implied that we had not looked into the federal revenue law for "the gladsome light of jurisprudence" to guide us in considering this appeal. We confess that we never thought of it. It is suggested that we should have searched it for the chance of finding some such provision as that now relied on. We venture to suggest in return, that we were educated, politically and professionally, in too high a reverence for federal authority in its sphere, to have thought possible such a provision in a federal statute.

It is supposed by some that compounding an offense was anciently an offense of equal grade with the offense compounded. However that may be, compounding a felony has been so long a crime as to have come down to us with its Saxon name of *theft-bote;* and compounding a misdemeanor of an essentially public nature has almost as long been an indictable obstruction of the course of public justice. 1 Russell on Cr., 194–5. Compounding a public offense, felony or misdemeanor, is essentially immoral, not *malum prohibitum*, but *malum in se;* proceeding upon " a wicked consideration;" " to gild over and conceal the truth. And whenever courts of law see such attempts made to conceal such wicked deeds, they will brush away the cobweb varnish, and show the transactions in their true light; that is, an agreement to stifle a prosecution." *Collins v. Blantern*, 2 Wils., 347; *Edgcombe v. Rodd*, 5 East, 294. "The compounding of penalties is an offense at common law, of dangerous tendency, highly derogatory to public example; and prosecutions are no more to be improperly suppressed by public informing officers, than by common informers. . . . . . . It is *contra bonos mores*, and of dangerous tendency, that any prosecuting officer may induce such settlement by using his official influence and power, to threaten with other prosecutions, and to offer to suppress them, in or-

der to procure a settlement of those already commenced and pending." *Hinesburgh v. Sumner*, 9 Vt., 23. And we should no more have thought of looking into the legislation of congress for a statute licensing the compounding of public crimes, than for a statute licensing the crimes themselves; or, to speak more accurately, licensing any other public crime. It might well be suggested, in the paper mentioned, that such a statute would shock ears accustomed to listen to the morality of the common law.

The respondent has been at pains to cite federal decisions to the familiar proposition, that all offenses against the United States are statutory, and that federal courts take no jurisdiction of crimes at the common law. He has, however, cited no case, we trust that the youngest of the profession may not live to cite one, tending to absolve federal courts, in the administration of criminal law, from the rules of public morality and decency taught by the common law.

But it is said that it was the policy of congress to treat offenses under the revenue law, not strictly as crimes to be prosecuted and punished always, but rather as a system of penalties and forfeitures in aid of the collection of revenue, satisfied when that end is attained. It is humiliating to confess that such appears to be a fair construction of the statute; that federal revenue officers may exact from iniquity the wages of impunity; that the federal treasury may swallow the price of unpunished public guilt, indulged for a "wicked consideration" — fraud, extortion, bribery, larceny, forgery, perjury; that the secretary of the treasury must accept the price of the indulgence, perhaps reconciling his conscience to the duty by saying, as was said of old, *non olet:* the United States of America, example and hope of the nations, playing *theft-bote*. The provision for compounding public offenses is essentially immoral, beyond all statutory power to purge it; tainting the whole statute. Immorality is essentially contagious. A corrupt part is apt to corrupt the whole. An immoral particu-

lar in a general system of procedure has a tendency to poison the entire system, as some diseases do all the functions of the natural body. And so it seems to have proved with this statute. What wonder that, when one class of revenue officers is authorized to compound crimes after they are committed, another class of them should take it upon them to compound crimes before they are committed; as indulgence for past sin is said to have insensibly degenerated into indulgence for future sin? What wonder that, when one set of revenue officers is authorized to compound crime on behalf of the public, another set should assume to compound crime on their own behalf? The common estimate of revenue officers is not such as to place them generally above the influence of bad example. It seems rash faith to trust inferior revenue officers in such matters, when their superiors are authorized, by the statute of their being, to receive a price for the commission of crimes, infamous in all the world and in all time; a price for restoring perjurers to competency as witnesses; a price for the inferior officers themselves to purchase continuance in office and capacity to hold other office, forfeited by crime. That is the statute as it is written.

It is said that the federal courts submit to this statute, and suffer revenue officers to compound crimes for which indictments are pending, without their consent; as it is said, " in spite of them." This may be so, though we should hope not, and we are referred to no case and know of none to show it. It is not for us to consider whether the federal judiciary is bound by such a statute, to surrender the exercise of judicial power, or to submit to such tyranny of immorality. It may be that paltry officers of the revenue service may arrest the proceedings of the federal courts, may loose the judicial hold upon extortioners, thieves, forgers and perjurers; baffling justice and defying punishment in open court, upon the ground that the guilty have paid a price for the privilege of guilt, a sordid substitute for benefit of clergy; nay, possibly,

that federal courts submit to see a price paid, effectual to annul their convictions and set at large their condemned prisoners, assoiled of all guilt and restored to all rights by bribes to the federal treasury.

. But these considerations are for the federal courts alone. *Non nostrum tantas componere lites.* We have considered the statute solely for the purpose of determining the morality of contracts made under it. Such contracts may be held lawful in the federal jurisdiction, though we hope not. But in this jurisdiction they must be held to ignore all sense of natural morality, to violate essential and fundamental principles of jurisprudence, to be against public policy and offensive to judicial integrity; tending to corrupt public morals and to promote obstruction of public justice.

We could not, in judicial propriety, sanction recovery here on any such contract. We should be conscious of prostituting the justice of this court, as well in upholding a contract to compound crime, made under the statute for the benefit of the general government, as in upholding a contract to compound a crime made in violation of the statute, for the benefit of the officer making it. The turpitude of the two would be the same in nature, though different in degree. The same principle would govern both. We cannot stoop to justify a doctrine universally recognized, and exhausted in the brief maxim, *ex turpi contractu non oritur actio.* And, in reason and by all the cases, the principle applies not only to the main contract compounding crime, but to all collateral contracts looking towards it, in aid of it or subordinate to it. We could no more enforce contracts compounding or tending to compound crime coming from the federal jurisdiction, than contracts of polygamy from the jurisdiction of Utah or of Turkey.

The respondent seems to think that we erred in applying the *lex fori* to a contract coming from another jurisdiction. The authorities are numerous and we think unanimous on the

point. The rule as it is understood in England, is happily stated by BEST, J., in *Forbes v. Cochrane*, 2 B. & C., 448: "The plaintiff, therefore, must recover here upon what is called the *comitas inter communitates;* but it is a maxim that that cannot prevail in any case where it violates the law of our own country, the law of nature or the law of God. The proceedings in our courts are founded upon the law of England, and that law is again founded upon the law of nature and the revealed law of God. If the right sought to be enforced is inconsistent with either of these, the English municipal courts cannot recognize it. I take it that that principle is acknowledged by the laws of all Europe." The supreme court of New Hampshire gives the rule in similar language, and applies it to a contract coming from a sister state, in *Smith v. Godfrey*, 28 N. H., 379. And PARSONS, C. J., in the famous case of *Greenwood v. Curtis*, 6 Mass., 358, says of the *comitas inter communitates:* "The rule is subject to two exceptions. One is when the commonwealth or its citizens may be injured by giving legal effect to the contract by a judgment in our courts. . . . . . . Another exception is when the giving of legal effect to the contract would exhibit to the citizens of the state an example pernicious and detestable." One jurisdiction cannot impose rules of public policy or morality upon another jurisdiction essentially different from its own. If such a contract as the respondent's is sanctioned by federal law, he may be able to find a remedy in a federal court: but not in the courts of this state.

In the former opinion, it was held that the respondent's contract is extra-professional. And it is noticeable that both the papers before us appear to overlook one becoming feature in the federal provision for compounding crime. When a criminal prosecution is pending in court, the assent of the attorney general is required to compound the offense: though it is hard to imagine the nominal head of the American bar giving it, if at all, with good grace. But otherwise the section

delegates no duty to the bar. It commits the power exclusively to revenue officers; fitter, it seems to be assumed, for such a function than members of a profession educated in the morality of the common law. The section imposes none of its dirty work upon the bar. It authorizes no member of the profession to negotiate or contract with criminals for compounding their crimes. That seems to be taken as more in the way of revenue officials. And so the statute leaves the power exclusively with the commissioner of internal revenue; to be executed, it is presumed, by that officer or some of his army of subordinates, supervisors, collectors and the like. But it spares the federal district attorneys all part in such negotiations and contracts. If such part be imposed upon them by treasury officials, it is imposed without color of authority in the statute.[1] With the single exception mentioned, the section seems to have been framed in our view of the character and function of the profession of the law. Surely it needs no argument to show that it is unprofessional to compound crime, unprofessional to advise in or be privy to the compounding of crime. One compounding for his crime can have no professional aid. It may be doubted whether the service which the respondent agreed to render was in aid of such a compounding as the statute contemplates. We need not inquire too curiously into that. Either way, within or without the statute, we cannot hold the respondent's contract a contract for professional service.

Had we been cited to the statute or aware of it, when we passed upon this appeal, it could not have affected our judg-

---

[1] Every district attorney or marshal who demands, or accepts, or attempts to collect, directly or indirectly, as payment or gift or otherwise, any sum of money or other property of value for the compromise, adjustment, or settlement of any charge or complaint for any violation or alleged violation of any provision of the internal revenue laws, except as expressly authorized by law to do so, shall be held to be guilty of a misdemeanor, and shall be fined in double the sum or value of the money or property received or demanded, and be imprisoned for not less than one nor more than ten years.

ment, though it would unquestionably have somewhat controlled the course of reasoning of the opinion. The statute undoubtedly gives such palliation as such a statute can, to some things criticised in the opinion. For that reason we regret that our attention was not then called to it. We of course desire all such criticisms understood as more or less qualified, as the statute bears more or less upon them. It would be tedious and is unnecessary to review them in detail. The two opinions will be taken together; and, as far as it may, the statute *ex proprio vigore* will play its part of scapegoat.

Pending this motion, as already intimated, we received a printed paper from two members of this bar, who happened to be employed in the prosecution of the federal indictments mentioned in the record. This paper gives their statement and view of their part bearing on the respondent's contract and service, and asks that it be published with the report of this case. One of these gentlemen was examined as a witness in the court below; and something like complaint is suggested, because we did not refer to his testimony. We rested our judgment, however, solely on the respondent's contract just as he stated it; referring but slightly and incidentally to his other testimony, and not at all, we think, to the testimony of any other witness. Some complaint is made that the opinion does these gentlemen personal and professional injustice. We trust not. Surely none was intended. A more careful reading of the opinion, it is hoped, will satisfy them of the fact that we abstained *ex industria* from any comment on their action. We endeavored to avoid allusion to it, because it was immaterial, and out of regard for gentlemen who could not then be heard. We cheerfully give them the hearing they now ask, and direct their petition to go with the report of this appeal. It is for them, not for us, to judge of its necessity, and of the ground of their action. The court has deep interest in the reputation of its bar. If these gentlemen erred in connection with the prosecutions in the federal court,

Wight vs. Rindskopf.

a question not before us, we cannot doubt that they erred unconsciously, perhaps in undue deference to federal authority and federal practice in such matters.   If we have inadvertently done them harm or given them offense, we can only deplore it. One of them is distinguished for ability in his profession, and has done nothing here to impair his standing or to forfeit the regard which the court owes to members of its bar.   We should be most reluctant to do him disservice.   The other has peculiar claim upon the respect of this court, of which he was so late and so long the honored chief.   His voluntary withdrawal to resume his place at the bar was the occasion of great and just regret to his associates and to the profession. The reports of the court bear witness to his great work in it; to the eminent ability, high character, professional learning, judicial tone of mind, and love of justice, which he brought to it.   His absence is still felt here.   His office in the court is filled, not his place.   Surely no member of this court could willingly expose him, could fail in regret to see him exposed, to any censure, personal or professional.

*By the Court.*— The motion is overruled.

Note.— The following is the paper referred to in the foregoing opinion:

MILWAUKEE, *February 13, 1878.*

*To the Honorable the Chief Justice and the Associate Justices of the Supreme Court of the State of Wisconsin:*

The undersigned, citizens of Milwaukee and attorneys and counselors at law of this honorable court, and also of the honorable the supreme and circuit courts of the United States, most respectfully represent that great injustice has been or may be done to them, both professionally and personally, by the course of remark pursued upon the state of facts assumed (your petitioners do not say improperly so) in the opinion recently delivered by your honors in the cause entitled *Orlando W. Wight, Respondent, v. Lewis Rindskopf, Appellant;* and, as such attorneys and counselors of this court and humble ministers to the justice dispensed therein, the good name and correct professional deportment of all of whom is so justly appreciated and carefully and zealously guarded in the opinion aforesaid, your petitioners most respectfully submit that they are entitled to the measure of relief hereby prayed.   The whisky prosecutions of 1875 and 1876, as well as the connection of your petitioners therewith as pros-

Wight vs. Rindskopf.

ecutors for the United States within this state, have become matters of public history. It is a fact, also, shown, as we understand, by the record in the cause aforesaid, and one which must necessarily appear in the published report thereof, that your petitioners are the "public prosecutor" mentioned and referred to in the opinion.

In vindication of their own honor and integrity, and of the honor and integrity of the exalted profession to which they belong, and which they reverence and would uphold in its purity to the utmost extent indicated by the opinion of your honors, your petitioners most respectfully ask that this petition and statement in their behalf may, by direction of this honorable court, be appended in the form of a note at the end of the report of the cause aforesaid, as the same shall appear in the regular series of the reports of the decisions of the court.

Your petitioners have not now, and never had, the slightest interest or concern, in any way, in the merits of the controversy aforesaid between the plaintiff *Wight* and the defendant *Rindskopf;* and it seems needless to remark in addition, to your honors or to others familiar with the course of judicial proceedings, that your petitioners never have had, and have not now, any adequate apportunity of self-vindication or self-defense, except in the manner herein sought — a measure of relief which, as your petitioners believe, can only be properly obtained by the order or direction of this court. Indeed, one of your petitioners had no knowledge whatever of the points in issue, or of the facts in evidence in said cause, until he learned the same upon perusal of the printed record and by the reading of the opinion of this court on the day of the date of this petition; whilst the other of your petitioners had little or no more actual knowledge upon the same subject, save that he was called and gave testimony as a witness upon the trial below, to a portion of which testimony reference will hereafter be made.

Your petitioners state the following as the facts occurring within their knowledge: Every proposition for immunity, total or partial, to any of the defendants in said prosecutions, whether made through the plaintiff *Wight* or other attorneys — for some were made through others,— came from your petitioners in the first instance as propositions of *compromise* offered by your petitioners as the agents and representatives, thereto explicitly previously authorized and directed in all cases, of both the treasury and law departments of the United States, which propositions of compromise were expressly authorized and sanctioned by a statute law of the United States. This power of compromise has been considered to be, and is, an absolute one in the department or departments in which it is lodged by law; that is to say, one which may be exercised upon any condition, not in itself unlawful or otherwise prohibited, which the head or heads of the department or departments may see fit to impose. They may impose — at least it has always been so regarded and acted upon — as one of the conditions to which the party compromising shall sub-

mit, that he shall appear and give true, full and unreserved testimony of all matters within his knowledge touching any frauds or offenses committed against the internal revenue laws of the United States. Such was one of the conditions upon which your petitioners, previously authorized and directed as aforesaid, insisted in every compromise or proposition for a compromise, and as to all of the defendants embraced in such compromise. It was one of the conditions upon which every compromise was effected. The proposition in connection with which the litigation here in question arose, was, under the circumstances above stated, fully matured and fixed in all its details by your petitioners before the same was communicated to the plaintiff *Wight*, to be by him presented for the consideration of the parties defendant to be affected by it. It was not contemplated at the outset, at least by your petitioners, that the plaintiff *Wight* should bargain with or receive compensation for his services from such defendants. The first knowledge of such employment and compensation came to your petitioners afterwards, pending said negotiations, and not a very long time before their services as public prosecutors closed. Such bargain or compensation, though your petitioners were in no way privy thereto or responsible therefor, was not, as will hereafter be seen, in the opinion of your petitioners, and as they now most respectfully submit, necessarily void or corrupt or contrary to the policy of the laws of the United States governing that particular class of cases. The alleged objectionable features of said bargain between the plaintiff *Wight* and the defendant *Rindskopf*, as the same are pointed out in the opinion of your honors, namely, that the defendants were to give testimony as the said *Wight* should advise and direct, and that said *Rindskopf* should pay said *Wight* for his personal or professional influence over your petitioners, never came to the knowledge of your petitioners until the reading of said opinion. Your petitioners utterly disavow all privity therewith or responsibility therefor, and say that said *Wight* neither possessed nor exercised any influence, personal or professional, over your petitioners, more than would have been possessed or exercised by any other respectable attorney; nor did your petitioners assent to the giving of such testimony.

The proposition for compromise, as originally matured and communicated by your petitioners, through the plaintiff *Wight*, was, with the exception perhaps of some minor and unimportant modifications made at the instance of the defendants or some of them, subsequently effected and carried out in all its details. The same was afterwards fully and publicly submitted to the court in which the cases, both civil and criminal, were pending, and received the explicit sanction and approbation of the court. Judgments were rendered and sentences passed in accordance with the terms of the compromise. It may be proper here to add that the compromise in question embraced a number of important stipulations concerning several civil actions which were also pending against the same parties under the internal revenue laws of the Uni-

ted States, as well as the disposition which should be made of the criminal cases.

In view of the common-law principles so ably discussed in the opinion of the court, applicable to common-law crimes, or crimes punishable by courts having common-law jurisdiction over the same, and of the rules of professional deportment governing in all such cases, and to which, as laid down in the opinion, your petitioners most fully assent, the words *compromising a criminal case* may sound strange to the ears of your honors. Your petitioners infer from the language of the entire opinion, for they have not examined the briefs of counsel engaged in the cause, that the attention of your honors was not directed to the law of congress in question, nor, so far as your petitioners are concerned, to the real nature of the transaction in connection with which the suit of the plaintiff *Wight* arose. It may be that not sufficient facts were disclosed by the record to justify such reference, either by court or counsel; but your petitioners venture to suggest that it may have been otherwise on the face of the record.

The law of congress under which the compromise in question was effected, is found at § 3229 of the Revised Statutes of the United States, and reads as follows: "The commissioner of internal revenue, with the advice and consent of the secretary of the treasury, may *compromise any* civil or *criminal* case arising under the internal revenue laws, instead of commencing suit thereon; and, with the advice and consent of the said secretary and the recommendation of the attorney general, he may compromise any such case after a suit has been commenced thereon."

On the trial in the court below, your petitioner McKenney was called as a witness on the part of the defendant *Rindskopf*, and as such was permitted to make, not in response to any questions put by counsel, but voluntarily, a partial, and but a partial, statement of the facts concerning said compromise, and the part borne by your petitioners in the same. On page 35 of the printed case will be found his testimony, as follows: "I made that agreement under the authority of the representatives of the United States treasury. John Hedrick was immediately in charge of the matters. I had direct authority from Secretary Bristow, and direct authority from the solicitor of the treasury. Mr. Bristow was secretary of the treasury at the time, and Bluford Wilson was solicitor of the treasury."

Looking to the provisions of the foregoing law and the policy which it enacts, it will at once be seen by your honors that the principles and policy of the common law relating to the prosecution of offenders, and forbidding the making of agreements or compromises by which they shall avoid punishment in whole or in part, have no application to an agreement or compromise such as this one was. It will be seen, instead of having been an agreement against public policy, it was sanctioned by positive law. It will be seen, instead of having been a treaty or agreement for the procurement of the testimony of an

accomplice, it was a treaty or agreement of a very different kind. It will be seen, instead of having been an agreement requiring the previous sanction or consent of the court, it was one which could be entered into without such sanction or consent, and, if we may be allowed the expression, *in spite of the court.* As has frequently occurred in practice, and doubtless will occur again, the compromise of a criminal case by the proper departments and in the manner prescribed by the act, takes the case out of court, and that whether the court will or no. The act has been so construed by the federal courts, and, as your petitioners respectfully submit, is incapable of any other fair interpretation.

Looking also to the provisions of the same law and the transaction as it was, and as it is in part at least disclosed by the record, your honors cannot but observe how baseless and unjust are the inferences of shame and dishonor to your petitioners, both personally and professionally, which may, indeed must, be drawn from the facts assumed in the opinion and criticised and enlarged upon by the court. There was nothing in the transaction on the part of your petitioners which might not have been done in open day and in the face of any man or of any court on earth. If vice there was in the transaction, it was not the vice of your petitioners, endeavoring as they were, under proper instruction received, faithfully to perform most arduous and difficult public and professional duties. Nor was it the vice of the heads of departments at the seat of government, struggling as best they could against a gigantic evil, nor of the federal court. It was the vice, if vice it was, of the law of congress, the policy of which seems to have been not to treat offenses punishable by its provisions strictly as crimes for which offenders are to be always prosecuted and punished, but rather as a system of penalties and forfeitures to be resorted to in aid of the collection of the internal revenue, and which are satisfied or no longer to be rigidly enforced when that end is attained. Revenue statutes are not to be regarded as penal, but are remedial in their character, as has been frequently held by the supreme court of the United States. But be this as it may, let the criticisms fall upon the law makers, and not upon the officers or courts whose duty it is to act upon and carry out the law.

As already observed, your petitioners have no concern with the merits of the action or with the contract entered into between the plaintiff *Wight* and the defendant *Rindskopf*, save only as the same may by possibility reflect upon or give character to the conduct of your petitioners after they learned that said *Wight* had received, or was to receive, compensation from the defendants in compromise. It is true, your petitioners made no objection. They did not feel called upon to do so. It did not occur to them, under the circumstances, that there was anything objectionable in the conduct of said *Wight*. Compromises of a similar nature, as your petitioners well knew, had, under the law aforesaid, before that time been effected, and generally through the agency of attorneys employed for that purpose, as the plaintiff *Wight* claimed he was. Such employment had been open, taken by most honorable and prominent

members of the bar, and never, to the knowledge of your petitioners, been considered unprofessional. Indeed, your petitioners did not conceive it improper for the plaintiff *Wight* to be so employed. It seemed to them that defendants under such circumstances were entitled to the assistance of an attorney of their choice. Your petitioners may have been grossly mistaken in this, but whether they were so or not, they cheerfully join with the court in acquitting the plaintiff of any bad faith, or improper motive, or intentional misconduct, so far as his professional intercourse and dealing with your petitioners were concerned.

The name and reputation of a member of the bar, however humble his sphere, as he has earned them and as they belong to him, untarnished by baseless suspicions of professional misconduct, corruption or wrong, are as sacred to him and to his posterity, as is the unsullied honor of a judge upon the bench to him and to those who shall live after him.

Your petitioners claim that it ought to be and is one of the privileges belonging to them as members of the bar of this honorable court, that the prayer of this petition should be granted.

Most respectfully submitted,                    L. S. DIXON,
                                                 J. C. McKENNEY.