WARD (WOOD v.). See Cases Nos. 17,965 and 17,966.

WARD, The AGNES H. See Case No. 99.

WARD, The JOANNA. See Case No. 7,328.

## Case No. 17,164.

WARDELL v. UNION PAC. R. CO. et al.

[4 Dill. 330; [1] 5 Cent. Law J. 527.]

Circuit Court, D. Nebraska. 1877.[2]

FRAUDULENT CONTRACT MADE BY OFFICERS OF A CORPORATION—CREDIT MOBILIER.

1. A contract made on behalf of a corporation by the executive committee of the board of di-

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

[2] [Affirmed in 103 U. S. 651.]

rectors with a third person, in which the members of the executive committee have a secret interest, is fraudulent as against the corporation, and the corporation may repudiate it, although it may have been long acted upon and recognized by the officers of the corporation who made it.

[Cited in Bill v. W. U. Tel. Co., 16 Fed. 16.]

[Cited in Higgins v. Lansingh, 154 Ill. 305, 40 N. E. 380. Cited in brief in Dunphy v. Traveller Newspaper Ass'n (Mass.) 16 N. E. 429.]

2. Accordingly, a contract made by the Union Pacific Railroad Company with a person who afterwards organized with others and formed a corporation called the Wyoming Coal and Mining Company, by which the former company conveyed the right to prospect for coal upon its line to the latter for fifteen years, agreeing to purchase coal needed for its use for the said term, from the latter, at prices named in the contract, was set aside on the ground of fraud, the officers of the Union Pacific Railroad being shown to have been jointly interested with the other party to the contract.

[Cited in U. S. v. Union Pac. R. Co., 95 U. S. 610; Thomas v. Brownville, Ft. K. & P. Ry. Co., 2 Fed. 878; Id., 109 U. S. 524, 3 Sup. Ct. 317, 318; Jackson v. McLean, 36 Fed. 216.]

3. After such a contract had been acted on for some years, the railroad company, on a change of management, having become the owner of nine-tenths of the stock of the coal company, forcibly took possession of the property of the latter company. On a bill filed by the owner of the one-tenth of the stock (he being the person with whom the fraudulent contract was made), the court decreed the contract to be fraudulent, and laid down the principles on which an accounting should be had between him and the railroad company.

This case is submitted to the court for final decree, on the bill and amended bill, the answers, replication, and evidence. The allegations of the plaintiff's bill, about which there is really no dispute, are that, on or about the 16th day of July, 1868, he and Cyrus O. Godfrey entered into a contract, in writing, with the Union Pacific Railroad Company, concerning the mining of coal in the lands of that company. This contract is made an exhibit of the bill, and reads as follows: "This agreement, made this 16th day of July, in the year of our Lord one thousand eight hundred and sixty-eight, between the Union Pacific Railway, by its officers, of the first part, and Cyrus O. Godfrey and Thomas Wardell, of the state of Missouri, or assigns, parties of the second part, witnesseth: That the said party of the first part agrees that the said parties of the second part may prospect, at their own expense, for coal on the whole line of the Union Pacific Railway, and its branches and extensions, and open and operate any mines discovered, at their own expense; that said railroad company agrees to purchase of said parties of the second part all clean, merchantable coal mined along its road, needed for engines, depots, shops, and other purposes of the company, and to pay for the same—the first two years at the rate of six dollars per ton, for the next three years at five dollars per ton, for the four years thereafter at four dollars per ton, and for the six years remaining at

the rate of three dollars per ton—delivered upon the cars at the mines of the said parties of the second part, and which shall not be less than ten per cent. added to the cost of the same to the said parties of the second part. This contract to be and remain in full force and effect for the full term of fifteen years from the date hereof. The said railroad company agrees to facilitate the operations of the said parties of the second part, in prospecting and otherwise, by means of such information as it may possess, and by furnishing free passes on its road to the agents of the parties of the second part, not exceeding six in number. Said railroad company further agrees to put in switches and the necessary side tracks, at such points as may be mutually agreed upon, for the accommodation of the business of the said parties of the second part; that the said parties of the second part agree to make all necessary exertions to increase the demand and consumption of coal by outside parties along the line of said railroad, and to open and operate mines at such points, where coal may be discovered, as may be desired by said railroad company, and to expend within the first five years from the date of this agreement, in the purchase and development of mines and mining lands, and in improvements for the opening, successful and economical working of the same, not less than twenty thousand dollars; also to furnish for the use of said railroad company good, merchantable coal, and to pay all expenses for improvements for loading coal into cars. Any improvement desired by said railroad company, in regard to the coal to be used by it, shall be at the cost of said railroad company. In consideration of their exertions to increase the demand for coal, and the large sum to be expended in improvements, it is further agreed that the parties of the second part shall have the right to transport over said railroad and its branches, for the next fifteen years from the date of this agreement, coal for general consumption, at the same freight that will be charged to others; but the said parties of the second part shall be entitled, in consideration of services to be rendered as herein provided, to a drawback of twenty-five per cent. on all sums charged for transportation of coal. The said railroad company agrees to furnish the parties of the second part such cars as they may require in the operation of their business, and to transport them as promptly as possible. This agreement to remain in force for fifteen years. The coal lands owned by said party of the first part are hereby leased for the full term of fifteen years to the said parties of the second part, or their assigns, for the purpose of working the same as may seem to them profitable; said parties of the second part to pay, for the first nine years, a royalty of twenty-five cents per ton for each ton of coal taken from their lands, excepting always coal taken from entries, air courses, or passage-ways, for which coal no royalty shall be paid; payments for the same being due and

payable monthly. The royalty for the last six years of this lease shall be free, provided the price of coal to the railway is reduced to three dollars per ton. If three dollars and twenty-five cents or more per ton, then, in that case, the royalty shall be as during the first nine years. In witness whereof, we have hereunto set our hands and seals, this, the day and year first above mentioned. (Signed.) Oliver Ames, President of the Union Pacific Railroad Company. Thomas Wardell."

The bill then alleges that, a few months after this, Godfrey assigned to Wardell his interest in the contract, and, after that, divers persons, with himself, organized, under the laws of Nebraska, a corporation called the Wyoming Coal and Mining Company, to which corporation he assigned the coal contract. Plaintiff alleges that, before this organization was effected, he had discovered and opened mines, and was in the profitable fulfillment of his part of contract by delivery of coal to the railroad company; and that, after the organization of this company and up to the 13th of March, 1874, he, as the superintendent, secretary, and general manager of the coal company, had successfully operated these mines, and had delivered all the coal needed by the railroad company, and that this latter company was at that date largely indebted to the former; that on that day the officers or agents of the railroad company, under a resolution of its board of directors, took forcible possession of the mines, books, papers, implements, tools, and personal property of the coal company, and have held and used them ever since; that the president and a majority, if not all, the directors and stockholders of the coal company, except himself, being also stockholders and directors in the railroad company, he can obtain no relief by any action of the coal company against the railroad company, and he prays the court for such relief. There are many other allegations which are denied, and about which there is conflicting testimony —such as the extent and nature of plaintiff's interest in the original contract, and also in the coal company; but the making of the original contract, the assignment of Godfrey's interest in it, the subsequent formation of the coal company, the assignment of the contract to that company, and the taking possession of its effects by the railroad company, are established facts in the case.

The answer of the Union Pacific Railroad Company says that the aforementioned contract was a fraud upon that corporation; that it was made, on the part of the railroad company, by the executive committee of the board of directors, the whole or a majority of whom were, by agreement with Godfrey and Wardell, to be jointly interested with them in the contract; that the terms of it were, for that reason, made so favorable to Godfrey and Wardell, and so unfavorable to the railroad company, as to enable the former to defraud the latter out of millions of dollars: that the organization of the Wyoming Coal and Mining Company was a device to enable the directors of the

railroad company to participate in the profits, and had been agreed upon between themselves and Godfrey and Wardell, before the contract with them was executed. They, therefore, deny its validity, and its binding obligation on the company, whether in the hands of Wardell, or of the Wyoming Coal Company As regards the taking forcible possession of the property of the coal company, they say that the railroad company had, by the assignment of the other stockholders than Wardell, become the owner of nine-tenths of the stock of the coal company; that differences arising between the railroad company and Wardell, who, as superintendent of the coal company, had control of its affairs, and being wholly dependent for fuel to run their trains on the supply furnished by that company, and fearing a suspension by Wardell of that supply, they were compelled, in self-defence, to take control of the property, of which they were the owners in the proportion of nine to one. They further allege that, after this, the railroad company and the coal company, by their several boards of directors, had a settlement of their transactions, by which the contract with Wardell and Godfrey was rescinded, and an indebtedness of the railroad company to the coal company of a million of dollars was agreed upon as a full settlement of all transactions between them; that both the coal company and the railroad company set apart and tendered to Wardell $100,000 for his share in the coal company, under that settlement. A general replication put all these allegations in issue.

J. M. Woolworth, for complainant.

A. J. Poppleton and E. Wakely, for defendants.

Before MILLER, Circuit Justice, and DUNDY, District Judge.

MILLER, Circuit Justice. This cause has been submitted for final decree on the pleadings and proofs. We have been aided by a full oral argument, which has been reproduced in print.

1. The first and most important inquiry is, whether the charge of fraud upon the Union Pacific Railroad Company (the principal defendant) in the inception of the contract of the 16th of July, 1868, is sustained by the proof.

After the fullest examination of the testimony, and the maturest consideration of the very fully printed arguments submitted to me during the summer vacation, I have reluctantly arrived at the clear conviction that it was a gross fraud upon that corporation and upon its shareholders, who were not interested in the contract.

The parties, on behalf of the railroad company, or rather the authority by which it was bound, was the executive committee of the board of directors of the company, and not the board itself. This committee was composed of a limited number of the directors, including the president. A majority of this committee, and those who are found to have been its controlling members, were interested in this con-

tract when it was made. They were, therefore, making a contract on behalf of the railroad company, with themselves, in a matter in which their interest was wholly adverse to the company, and on their own side. Such a contract is void upon the clearest principles of public policy. The corporation is represented by an agent who controls both sides of the contract, and whose interest is in every way against his principal and in his own favor. All the selfishness of human nature is brought into play to secure terms most favorable to the party who acts for both parties, himself being one of them. While the glaring evil of this thing may be obscured by using the name of the corporation as one party, and that of individuals having no connection with the corporation as the other party, the danger that selfish greed will make with the agents of the corporation a contract of which they will reap the advantage and in which the corporation will suffer all the losses, is only increased by the fact that the names of the parties really interested do not appear in the transaction.

The fraudulent character of this contract is not lessened by an inspection of its terms, or the evidence of its actual operation. It gave up the control of all the coal lands of the company for fifteen years. It bound them for that time to purchase all the fuel for a railroad of over a thousand miles from this company. It fixed the price to be paid at rates which, if the coal could be obtained at all in these lands, would amount to a fabulous profit. And it exacted no security from Godfrey and Wardell, who were men of limited means, for the performance of their contract to expend a considerable sum of money in seeking for and developing the coal mines.

We accordingly find that Mr. Wardell now claims, after a few years' operation under that contract, in which he has been repaid all his actual outlays with large profits, that the company organized under it was, when seized by the railroad company, possessed of property and rights of the value of two or two and a half millions of dollars. What was given for this? Nothing. It was made, if it existed at all, out of the property and the necessities of the railroad company, by means of the betrayal of its rights in that contract.

On the part of complainant, it is scarcely denied that the part taken by the executive committee and by Godfrey in this transaction was very reprehensible. But a vigorous effort is made to show that Wardell is innocent of anything wrong. The argument is that though Wardell was in the same building or suite of rooms occupied by the railroad company, or its executive committee, while the negotiations were going on which preceded the execution of the contract, he was kept in actual ignorance that any of the executive committee were to have an interest in it, until after it was signed. And Wardell testifies that he was kept in an outer chamber while Godfrey was taken into the sanctum where the chief priests of the fraud were consulted; and that he knew nothing of

the interest which those men had or were to have in the contract until it was all over.

If this were true, it would be difficult to see how he can escape responsibility for their acts and the knowledge of his partner. If he chose to entrust that partner with negotiation of the contract, while he sat twirling his thumbs within ear-shot of what was going on, he must be bound by the result when he accepted and signed the agreement. To meet the force of this objection, it is urged in argument that the contract was made and completed on the 15th, and that nothing was said, even to Godfrey, of the interest of those members of the executive committee in it, until the 16th.

But for the zeal which the very able counsel for complainant has brought to the aid of this argument, I should feel inclined to give it but little consideration. In the first place, the contract bears date on this day—the 16th. It must, therefore, be prima facie held to have been made on that day. Next, while Mr. Wardell admits that on that day he did learn and consent to the arrangement by which all but one-tenth, or at most two-tenths, of the interest in that contract was to be divided among certain members of the executive committee, it is hard to perceive how the fact that he learned and consented to this on that day mitigated its flagitious character. And, lastly, it appears that neither Wardell nor Godfrey took possession of the written instrument, but that it was left, with their consent, in the hands of the clerk of the construction company, or credit mobilier, whose history has been so much ventilated since. Wardell stands alone in his version of this part of the transaction, and he is directly contradicted by Godfrey, who, when testifying, had no interest in the matter.

It is not necessary to refer to all the testimony on this subject. It leaves in my mind no doubt that both Wardell and Godfrey knew they were getting a more advantageous contract from the railroad company by reason of the interest which the officers of that company were to have in it, and that such was their purpose and expectation from the beginning.

An attempt is made to negative the fraudulent character of the contract by the testimony of the members of the executive committee, to the effect that all they did was in the interest of the railroad company, and that they always intended to hold their interest in that contract in trust for the company. But I am satisfied that this is an afterthought, born of the odium of the credit mobilier explosion, and not at all established by the fact that after all had been discovered and difficulty with Wardell became imminent, they made a declaration of trust in favor of the company.

Nor do I see that the fact so much insisted on, if it were proved, that the Wyoming Coal Company scheme, or the scheme of any corporation by which the interests of the members of the executive committee in the contract might be realized and identified, was one conceived sometime after the contract was made, instead of before, is material. It is true that

the answer avers that it was agreed on at the time the contract was made, and that this is not very clearly established. But whether that interest was to remain a secret trust in the contract in the hands of Godfrey and Wardell, or a recognized interest in a corporation founded on that contract, can make no difference in the fraud on which it was founded. It is the same contract, obtained by the same means, and controlled in its inception by the same parties, in the one case as in the other. Nor is there anything in the subsequent history of the transactions between the parties to remove the vice which attaches to that contract by reason of the fraud. The same men who made the contract on the part of the railroad company remained in its directory and had control of its affairs until about the time the rupture with Wardell took place. As soon as a new set of men, with Mr. Jay Gould at their head, obtained control of the corporation, they began to take measures to get rid of the contract. It is idle to say that the men by whose fraud the contract was executed, could, by their recognition of it afterwards, make it obligatory on the company, or estop it from setting up the fraud when it is made the foundation of a suit. It may be that the company cannot recover back money paid under that contract, but it seems very clear that it cannot be made to pay any more in compliance with its terms, by the action of a court of equity.

By what rule, then, shall we measure Mr. Wardell's rights? He has spent time and labor and money in discovering these mines, and in placing them in condition to be profitably worked. There has been accumulated in his hands, or in the hands of the Wyoming Coal Company, property of considerable value, which was taken possession of by the railroad company, and is still retained by it. Apart from the contract, and if it had never existed, he is entitled to a fair and reasonable compensation for his labor and time and skill. The fraud gives the railroad company no right to these without just compensation. This, however, cannot be measured by the profits of the mining as fixed by the prices of the contract, or the prices subsequently fixed between the two companies, for the mines were and are the mines of the railroad company, the coal was and is their coal, and the profits are their profits, except so far as Mr. Wardell's labor, skill, and any money actually advanced by him in the progress of the business, might authorize him to claim a share of those profits.

I am of opinion that, whatever moral excuse for the seizure of the property of the coal company by the railroad company may be found in the existing circumstances, the act was unwarranted in law. Nor do I think that Wardell can be bound by a settlement made by the directors of the two companies, for the same reason that his contract is not valid, namely, that both interests were practically represented by the same parties, and both were hostile to him. But while there is here no defence of the company against Wardell, the extent of his remedy remains to be considered. The con-

tract cannot be restored, for it never had a valid existence. The mines must remain under the control of the railroad company, for the possession of Wardell and the coal company was a fraudulent one. The transactions of the past cannot be measured by the prices of that contract, for the same reason. The two companies have made a nominal or formal settlement of this question, which binds them, and they offered Mr. Wardell his share—all that, I think, as a member of the coal company, he is entitled to.

I have grave doubts, with the views which I entertain as to the principles on which an accounting should be had, whether he can get any more. I am inclined to give him a decree for the one hundred thousand dollars which has thus been offered to him, without interest to the date of the decree, each party to pay his own costs. But if he insists upon a reference to a master for an accounting, he can have such an order, the account to be taken on the basis of a fair compensation for his time, skill, and services while engaged in the business, with a return of his money actually invested, and compensation for its use—the sum thus ascertained to be credited with what he has actually received, during the time, out of the business. If plaintiff accepts the former alternative, let a decree be entered accordingly. If he claims the latter, and it becomes necessary, I will consider a written or printed argument as to the basis of the reference.

Decree accordingly.

[Upon an appeal to the supreme court, the decree of this court was affirmed. 103 U. S. 651.]