COOK and others, Ex'rs, *v.* SHERMAN, Assignee, and others. (Two Cases.)

*(Circuit Court, D. Iowa, C. D. May, 1882.)*

1. CORPORATION — OFFICERS AND DIRECTORS ACQUIRING ADVERSE INTEREST — CONTRACT—SPECIFIC PERFORMANCE.

Where the officers and directors of a railroad company enter into a contract to purchase lands and to locate the line of their projected road and its depots and stations on or near the lands so purchased, such a contract is contrary to public policy, and one which will not be enforced or made the basis of any relief in a court of equity.

2. SAME—DUTY OF DIRECTORS.

Directors of a railroad corporation are *quasi* public officers; they occupy a position of trust and act in a fiduciary capacity; they represent the stockholders, and cannot acquire any interests adverse to them.

3. SAME—ILLEGAL CONTRACT—RIGHTS OF PARTIES.

Where several persons enter into an illegal contract for their own benefit, and the illegal transaction has been consummated, and the proceeds of the enterprise have been actually received and carried to the credit of one of such parties, so that he can maintain an action therefor without requiring the aid of the illegal transaction to establish his case, he may be entitled to relief.

4. Limitation in Bankruptcy—Rev. St. § 5057—Fraud—Action against Assignee.

In a suit for fraud, the limitation prescribed by Rev. St. § 5057, does not begin to run until the discovery of the fraud; and, in an action against the assignee of a bankrupt, he will be chargeable with constructive notice of any concealment of the fraud by the bankrupt; and if the facts constituting the fraud were known only to the bankrupt, and were of such a character as to conceal themselves, no proof of actual concealment by the assignee is necessary.

5. Trustee and Cestui Que Trust—Purchase of Trust Property.

Where several parties buy real estate, and the title is taken in the name of one of them for their joint benefit, with authority to sell the same and divide the proceeds, the party holding the title is a trustee, and he cannot purchase the interests of the others unless he makes a full and fair disclosure of all the facts, and enables them to deal with him on terms of perfect equality.

6. Same—Settlement of Accounts—Rescission of Contract.

The rule respecting the rescission of a fraudulent contract immediately upon the discovery of the fraud, and the return of the consideration by the defrauded party, does not apply to a settlement of accounts between trustee and cestui que trust, in which the trustee; by concealing material facts, obtains a conveyance of the trust property for an inadequate consideration.

On Final Hearing.

In 1868 B. F. Allen, Ebenezer Cook, who were directors of the Chicago, Rock Island & Pacific Railroad Company, and John F. Cook made a verbal contract to purchase grounds for the company upon which to locate its stations between De Sota, Iowa, and Council Bluffs, and also for the purchase of lands adjacent to such stations, a part of which was to be laid out into town lots. J. F. Tracy, the president of the company, and E. H. Johnson, the chief engineer, were to have an interest in the profits, though not named in the contract. In 1870 this agreement was reduced to writing, and provided that Allen should advance the money to make the purchases, to be returned to him out of the money realized from the sale of the lands, with 10 per cent. interest, the title to be taken in his name for their joint benefit, the lands sold by him, and the profits paid, one-half to Ebenezer Cook, one-fourth to Allen, and one-fourth to John P. Cook. Allen sold some of the lands, and kept an account of his receipts and expenditures, but such account was disputed. John P. Cook sold his interest to E. E. Cook in 1871, and he and Ebenezer Cook having died, their legal representatives and heirs joining E. E. Cook as a party, instituted suits to set aside an assignment made to Allen in settlement of their affairs, alleging fraud and misrepresentations on the part of Allen. Allen having been adjudged a bankrupt, Hoyt Sherman, made defendant in the suits, was appointed his assignee, and afterwards made receiver in these cases. The facts alleged to constitute the fraud were discovered August, 1878, and the bills filed, respectively, March 24, 1880, and May 10, 1880.

*Wright, Cummins & Wright* and *Bills & Block,* for complainants.

*Nourse & Kauffman,* for respondents.

McCrary, J. In these cases the two most important questions to be considered are,—*First,* is the contract declared upon contrary to

public policy so that no relief can be based upon it? and, *second*, if so, have the complainants made out a case for relief independently of the contract?

It clearly appears that Allen and Ebenezer Cook, who were directors of the Chicago, Rock Island & Pacific Railroad Company, and J. F. Tracy, the president, and Edward H. Johnson, the chief engineer, of that company, entered into an agreement into which John P. Cook was admitted as a party in interest, to purchase the lands in question in advance of the location of the line and of the depots and stations of said railroad, with a view to locating the same on or near such lands. Such a contract by officers of a railroad corporation is contrary to public policy, and one which will not be enforced or made the basis of any relief in a court of equity. The directors of such a corporation are *quasi* public officers. They occupy a position of trust and act in a fiduciary capacity. They represent, not themselves, but the stockholders. They are, in all their official actions, to consider, not their private interest, but that of the stockholders, whose property they manage and control. If, as in this case, they are directors of a railway company, with power to locate and construct a public highway, they owe a duty to the public as well as to the stockholders, and are therefore doubly bound to abstain from entering into any scheme to pervert their trusts to their private gain. The law does not permit these officials to subject themselves to any temptation to serve their own interests in preference to the interests of the stockholders and of the public.

If the courts should enforce such contracts they would lend their sanction to a practice the inevitable tendency of which is to encourage breaches of trust to the sacrifice of private rights and of the public interest. The managing officers of *quasi* public corporations, possessing vast powers and engaged in great enterprises, are too apt to forget that they are not to have any interest adverse to those whom they represent, and the courts of justice should not in the least relax the rule requiring of them scrupulous fidelity and entire impartiality in the discharge of their official duties.

The present case well illustrates the importance of the rule of law to which we refer. The parties interested in this contract controlled the location of the railroad and of its depots and station grounds. After they had bought lands along the line, with a view to making money by the location of the line and of the depots and stations upon or near them, it needs no argument to show that they were utterly unfit and incompetent to decide as between a location upon their own lands and a location elsewhere.

It follows that the contract under consideration can neither be enforced nor made the basis of any relief whatever in a court of equity. The court will leave the parties to such a contract precisely where it finds them. *Marshall* v. *Railroad Co.* 16 How. 314; *Bank* v. *Owens,* 2 Pet. 539; 2 Redf. Ry. 576–584; Pom. Spec. Perf. 284–286; *Wight*

v. *Rindskopf*, 43 Wis. 344; *McWilliams* v. *Phillips*, 51 Miss. 196; *Guernsey* v. *Cook*, 120 Mass. 501; *Setter* v. *Alvey*, 15 Kan. 157; *Creath's Adm'r* v. *Sims*, 5 How. 204; *Bestor* v. *Wathen*, 60 Ill. 138.

This brings us to the consideration of the second question, which is, have the complainants shown themselves entitled to relief independently of the illegal contract? It has been decided by the supreme court of the United States that "where several persons enter into an illegal contract for their own benefit, and the illegal transaction has been consummated, and the proceeds of the enterprise have been actually received and carried to the credit of one of such parties, so that he can maintain an action therefor without requiring the aid of the illegal transaction to establish his case, he may be entitled to relief." *Brooks* v. *Martin*, 2 Wall. 70; *Planters' Bank* v. *Union Bank*, 16 Wall. 483:

The rule upon this subject is accurately stated in the last-named case, as follows:

"But when the illegal transaction has been consummated; when no court has been called upon to give aid to it; when the proceeds of the sale have been actually received, and received in that which the law recognizes as having had value; and when they have been carried to the credit of the plaintiff, —the case is different. The court is there not asked to enforce an illegal contract. The plaintiffs do not require the aid of any illegal transaction to establish their case. It is enough that the defendants have in hand a thing of value that belongs to them."

According to this rule, the question in such cases must always be, can the plaintiff maintain his action without enforcing the illegal contract? or, in other words, has he a cause of action independently of the illegal contract? If it appears that the defendants in a given case have received money or property from the complainants, and which belongs to the latter, the same may be recovered without any inquiry into the nature of the contract under which such money or property was acquired. The distinction is between enforcing an illegal contract and asserting title to money and property which has arisen from it. Applying this rule, we have no difficulty in holding that the complainants in the case last above named cannot recover.

It does not appear that Ebenezer Cook ever contributed any money, property, or services towards the acquisition of the property in question. His representatives, therefore, have no right which can be enforced without the aid of the illegal contract. As to them, the bill, in effect, is a suit to enforce the contract by decreeing a division of profits in accordance with its terms. It follows that the bill in that case (No. 1,779) must be dismissed.

As to the other case there is more difficulty. The evidence does show that John P. Cook contributed his services, and probably, also, he expended some money to acquire the property in question. His representatives, therefore, are, upon the principle above stated, entitled to an accounting, and to receive from the joint account such sum

as he would have been entitled to by reason of those contributions, unless the suit is barred by law or by reason of the laches of the complainants.

It is insisted that the suit is barred by the two-years limitation provided by section 5057 of the Revised Statutes of the United States, which requires that all suits at law or in equity against an assignee in bankruptcy, touching any property or rights of property transferable to or vested in such assignee, shall be brought within two years from the time when the cause of action accrued. It will be borne in mind that this suit is brought to set aside for fraud the release executed by complainants to Allen, as well as to recover the complainants' share in the joint account. The suit was not brought within two years from the execution of said release, but we think the proof shows that it was brought within two years from the time when the complainants discovered the facts. If the facts were such as to render the transaction fraudulent, then the statute did not begin to run until they were discovered. *Bailey* v. *Glover*, 21 Wall. 342.

In that case it was held that the statute above referred to is a statute of limitation precisely like other statutes of limitation, and that in construing it we are to apply the rule that, where the action is intended to obtain redress against a fraud concealed by the party, or which from its nature remains secret, the bar does not commence to run until the fraud is discovered.

Without discussing at length the question of fact presented, we hold that the release was obtained by Allen under circumstances which renders it fraudulent and void. The relation which existed between the parties was one of trust and confidence. The title was vested in Allen, to be held for the use and benefit of the other parties in interest. He was advised as to the situation and value of the property, and as to the state of the joint account. He was bound, therefore, to make a full and fair disclosure of all the facts so as to enable the other parties to deal with him upon terms of perfect equality. He seems to have assumed, on the contrary, that he was at liberty to make the best bargain possible for himself. He did not accurately state to them the condition of the joint account, or the amount of his claim against the same, and by his actions and words he led them to believe that it was extremely doubtful whether any profit could be realized out of the transaction, and in this belief they executed the release. It must therefore be held to be fraudulent and void.

The complainants did not discover the facts constituting this fraud until within less than two years from the time of the commencement of this suit. It is insisted by counsel for respondents that the statute does not apply to this case because the assignee in bankruptcy, who pleads the limitation, is not charged with the commission or concealment of any fraud. It is said that the rule applies only to a case

where the party pleading the statute is himself guilty of a fraud, which he has concealed, and that therefore it does not apply to the assignee. While the general rule is, no doubt, as stated, it does not follow that a distinction in this respect can be made between the bankrupt and his assignee. For the purposes of the statute of limitations they must be treated as one person. The assignee takes the place of the bankrupt. If, by reason of the fraud of the bankrupt, the two years' limitation had not commenced to run at the time of the bankruptcy, it did not begin to run by reason alone of the transfer of the estate to the assignee. The question in every such case must be, did the fraud continue to be unknown to the plaintiff after the appointment of the assignee, without any negligence or laches on the part of plaintiff? If, indeed, the fraud of the bankrupt was of such a character as to require special efforts on the part of the assignee to keep it secret, so that but for such efforts on his part the plaintiff must have discovered it by reasonable diligence, then it might be necessary to show affirmative acts of concealment on the part of the assignee; but if the facts constituting the fraud were known only to the bankrupt, and were of such a character as to conceal themselves, no proof of actual concealment by the assignee is necessary. The assignee himself may be ignorant of the fraud, as in most cases it is to be presumed he would be, yet he represents the bankrupt, stands in his shoes, and is charged with constructive notice of his fraudulent acts. If it were otherwise, the bankrupt might, by concealing even the grossest frauds for two years from the assignee, as well as from others, be enabled to consummate them. We hold, therefore, that it is not necessary to show in this case affirmative acts of concealment on the part of the assignee. As we shall presently see, the facts constituting the fraud on the part of the bankrupt, or at least a material part of them, were such as to conceal themselves.

It is also insisted that this case does not fall within the rule laid down in the case of *Bailey* v. *Glover*, because the fraud was not concealed by any affirmative acts of Allen. Is it true that complainants are bound to show such affirmative acts? The rule upon the subject by which we must be governed is thus stated in the opinion of the court, pronounced by Justice MILLER, in *Bailey* v. *Glover*:

"We also think that, in suits in equity, the decided weight of authority is in favor of the proposition that where the party injured by the fraud remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party."

In this case, as we have already seen, the fraud was committed by a trustee against his *cestui que trust* by failing to make a full disclosure as to the state of the joint account, and as to the value of the joint estate. The proof shows, as we have already said, that the

facts as to the state of the accounts were exclusively within the knowledge of Allen; and it is apparent, also, that as to the location, character, and value of the lands he had far better means of knowledge, and doubtless much more accurate information, than any other of the parties in interest. In fact, after the death of John P. Cook, the parties in interest, aside from Allen, had little or no information upon the subject.

In view of the relation existing between the parties, we are of the opinion that the complainants were at liberty to rely upon the representations of Allen as to the value of the lands acquired under the contract, without visiting and examining the lands, or investigating for themselves the question of their actual value. But a further and more conclusive answer to this suggestion is to be found in the fact that the misrepresentations and concealments by means of which the release was obtained did not relate exclusively to the value of the lands, but had reference in part to the joint account, the amount of Allen's claim against the same, and the balance in his hands for distribution, all being matters exclusively within Allen's knowledge, and concerning which the complainants were obliged to rely upon him. The amount of Allen's claim against the joint account was largely overstated by him, and the quantity of land sold and the sum realized from sales by him was largely understated, as was also the amount of bills receivable held by him. These matters of themselves were sufficient to render the transaction null and void, without reference to the representations made concerning the value of the lands, and they are manifestly matters which could not be discovered so long as Allen chose to conceal them. In other words, they constituted a fraud which was of such a nature as to conceal itself.

It is insisted that the complainants, or some of them, had information more than two years before the commencement of this suit, which was sufficient to put them on inquiry and charge them with notice of the fact. The proof is that E. E. Cook heard Thomas F. Withrow remark, more than two years before the commencement of this suit, that Allen had defrauded or swindled the other parties in interest; but the remark was made in a casual way. No particulars of any alleged fraud were given, and Cook, having strong faith in Allen's integrity, might well have disbelieved and disregarded the statement. There is nothing to show that his confidence in Allen was shaken by the remark, and, if not, he was not called upon to act upon it. We hold that the suit is not barred by the statute.

Another question of some difficulty arises in this case. It is whether the complainants were bound, immediately upon the discovery of the fraud, to give notice of rescission, and to offer to return the consideration for the release, within the principle of *Grymes* v. *Sanders*, 93 U. S. 62. After much consideration we have reached the conclusion that the doctrine of that case does not apply here.

The transaction which we are now considering was not a contract of purchase and sale in the ordinary sense, but it was a settlement between a trustee and his *cestui que trust*. Allen, as trustee, held certain money and property belonging to complainants; the complainants had received some money and property on account. Upon settlement it was agreed that Allen should hold all in his hands, and complainants should keep what they had themselves. Nothing was actually paid. The complainants kept in their possession what they had previously received. In such a case there was nothing to return, and the reason for prompt rescission and return of the consideration does not exist. It is enough if the party defrauded in such a settlement, upon bringing a suit to set it aside, avers a willingness to be charged with the sum in his hands. It would be an idle and useless proceeding to require him to pay it over to the trustee and immediately decree its return to him. We do not think that the doctrine respecting the rescission of a fraudulent contract upon the discovery of the fraud, and the return of the consideration received by the defrauded party, applies to settlements of accounts between trustee and *cestui que trust* under the circumstances of the present case. See *Elfelt* v. *Hart*, 1 McCrary, 11; S. C. 1 FED. REP. 264.

It may be said that, in order to hold that Allen was a trustee for John P. Cook with respect to the services or property put into the joint account by the latter, it is necessary to take notice of the provisions of the illegal contract, and that this court cannot do. A sufficient answer to this suggestion is that while the illegal contract cannot be enforced or made the basis of relief, there is nothing in the law of evidence, or in the principles of equity, to prevent its being considered as evidence in a case between the parties to it, and as defining their relations to each other with respect to the property acquired under it. As evidence, the contract may be competent as tending to show the right of plaintiff to recover independently of any contract rights conferred by it.

The result of these views is that there must be a decree in this case setting aside, as fraudulent and void, the release, assignment, and conveyance executed by the executors of John P. Cook, and the said Edward E. Cook individually, to said B. F. Allen of their respective interests in the joint account and property, and for an accounting, to the end that the complainants may recover to the extent of the value of the services rendered and money contributed by John P. Cook to the joint account; and for the purpose of ascertaining the sum to which they are entitled, this case will be referred to a master for such accounting and for report.

A question may arise as to the proper measure of damages. Can complainants recover upon the basis of the contract, or only for the value of the services, etc., contributed by him to the joint account? We do not decide this question now, but will direct the master to re-

port the sum that would be due upon each hypothesis, reserving the question until the final hearing.

LOVE, J., concurs.

---

I. RELATIONS OF CONFIDENCE BETWEEN DIRECTORS AND STOCKHOLDERS —EFFECT OF DIRECTORS BEING INTERESTED ADVERSELY TO CORPORATION. The case of *Goodin* v. *Cincinnati & Whitewater Canal Co.*[1] is a leading case upon the first question discussed in the foregoing opinion. In that case it appeared that the canal company owned a canal extending from Harrison to Cincinnati; that the I. & C. R. R. Co.'s road extended from Indianapolis to Harrison, from which point it reached Cincinnati over the tracks of another company. Desiring to have a line of its own to that city, a corporation was formed by the officers of the I. & C. Co., known as the C. & I. R. R. Co., to purchase the canal property; one H. C. Lord being president of both railroad companies. Lord proceeded to purchase a majority of the stock of the canal company at nominal rates, and to elect directors favorable to the interests of the railroad companies, who chose Lord as president of the canal company. A condemnation proceeding was then begun in the probate court by the new railroad company to condemn the canal property for its purposes. By agreement of the directors of that company and the canal company a judgment was entered assessing the damages at $55,000. At that time the canal company was largely in debt, three several mortgages being upon its entire property, which were then in suit in the district court. Through the instrumentality of said Lord, who had, on behalf of said railroad companies, purchased at nominal figures a controlling amount of the mortgage debts represented in that suit, an order was entered placing the $55,000, agreed on in the condemnation proceedings, in the hands of Lord, as receiver, in lieu of the property. Lord, as president of the C. & I. R. R. Co., drew a check for that amount upon its funds in favor of himself, as receiver. The railroad company took possession of the canal property, and expended large sums in adapting the same to its uses. Upon bill filed by a stockholder and creditor of the canal company to set aside these proceedings, it appeared that the property was worth much more than $55,000. The court held that these proceedings were fraudulent, and the railroad company must account for the real value of the canal property; and that "the rule of valuation in such cases is what the interest of the canal company was worth, not for canal purposes merely, or for any other particular use, but what it was worth generally for any and all uses for which it might be suitable." In the course of his opinion WELCH, J., said: "As to the *agreement,* by which the price or compensation was fixed at $55,-000, we have no hesitation in saying that it ought not to be allowed to stand so as to affect the rights of those who gave no assent thereto. Without attempting to decide as to the power of directors, in absence of authority given by the stockholders, to fix a price or compensation for the property so sought to be appropriated, it is enough to say that this is not such an agreement as equity will sustain. There was not only such a gross inadequacy of price as to shock the moral sense, but there was, in effect, a sale by a trustee to himself, or to his own use and benefit. This equity will never permit, not even where there is good faith and an adequate consideration. Here there was neither. The vendor and purchaser were in the same interest. As directors of the canal company it was the *duty* of Mr. Lord and his associates to obtain the *highest* price for the property; while as stockholders of the railroad company it was their *interest* to get it as *low* as possible. It was, in effect, a sale by the railroad company to itself. There was no adverse interest, or ad-

---

[1] 18 Ohio St. 169.

versary parties, and the sale was a mere form. Nothing is better settled in equity than that such a transaction, on the part of a trustee, does not bind the *cestui que trust*. It is equally well settled that the property of a corporation is a trust fund in the hands of its directors for the benefit of its creditors and stockholders.[1] If it was desired or intended to make such a purchase of the property as would bind the stockholders and creditors of the canal company, *all* of them should have either been consulted or bought out. That would have been the fair way to accomplish the object. To undertake, by getting control of the company, and then, under pretense of acting as *agents and trustees for all* the stockholders and creditors, deliberately to trample under foot the rights of the minority, is rather a sharp practice, and one which a court of equity will never tolerate. A director whose personal interests are adverse to those of the corporation has no right to be 'or act as a director. As soon as he finds that he has personal interests which are in conflict with those of the company, he ought to resign. No matter if a majority of stockholders, as well as himself, have personal interests in conflict with those of the company. He does not represent them as *persons*, or represent their *personal* interests. He represents them as *stockholders*, and their interest *as such*. He is trustee for the *company*, and whenever he acts against *its* interest—no matter how much he thereby benefits *foreign* interests of the individual stockholders, or how many of the individual stockholders act with him—he is guilty of a breach of trust, and a court of equity will set his acts aside at the instance of stockholders or creditors who are damnified thereby. Any act of the directory by which they intentionally diminish the value of the stock or property of the company is a breach of trust, for which any of the stockholders or creditors may justly complain, although all the other stockholders and creditors are benefited, in some other way, more than they are injured as such." [2]

In *Rolling Stock Co.* v. *Railroad Co.*[3] the same court said: "The rule which prevents the agent or trustee from acting for himself in a matter where his interest would conflict with his duty, also prevents him from acting for another whose interest is adverse to that of the principal; and in all cases where, without the assent of the principal, the agent has assumed to act in such double capacity, the principal may avoid the transaction at his election. No question of fairness or unfairness can be raised. The law holds it constructively fraudulent, and voidable at the election of the principal." These principles are supported by a long line of authorities.[4] The decisions are collected and the doctrine clearly and accurately stated in Morawetz, Priv. Corp.,[5] which, in my humble judgment, is the best work yet written on the subject.[6]

II. RECENT CASES. It is not my purpose in this note to consider the question at large. It is so fully discussed in the works named that all that will be attempted here will be to refer to some of the very recent cases upon the subject.

A court will refuse to give effect to arrangements by directors of a railroad

---

[1] Story, Eq. 1252; Aberdeen R. Co. v. Blackie, 1 Macq. 461; Wood v. Dummer, 3 Mason, 309.

[2] Pages 182, 183.

[3] 34 Ohio St. 450, 460, (1878.)

[4] Cumberland Coal Co. v. Sherman, 30 Barb. 553; Aberdeen Ry. Co. v. Blackie, 1 Macq. 461; York Buildings Co. v. Mackenzie, 3 Paton, H. L. 378; Koehler v. Black Riv., etc., Co. 2 Black, 715; Cumberland Coal Co. v. Parish, 42 Md. 598; Blake v. Buffalo Creek R. Co. 56 N. Y. 485; Covington, etc., R. Co. v. Bowler, 9 Bush, 468; Port v. Russell, 36 Ind. 60; Cook v. Ber-

lin, etc., Co. 43 Wis. 433; Harts v. Brown, 77 Ill. 227; Stewart v. Lehigh Valley R. Co. 38 N. J. Law, 505; Rice's Appeal, 79 Pa. St. 168; First Nat. Bank v. Gifford, 47 Iowa, 575; Levisee v. Shreveport, etc., Co. 27 La. Ann. 641; Austin City R. Co. v. Swisher, (Tex. Ct. App.) 15 Reporter, 760.

[5] Sections 243 et seq..

[6] See, also, Pierce on Railroads, 36 et seq.; Thompson, Liab. of Officers, etc., of Corp, 360 et seq.; 16 Amer. Law Rev. 917; Bissit v. Ky. Riv. Nav. Co. 15 Fed. Rep. 353, and note.

company to secure, at its expense, undue advantages to themselves by form-ing, as an auxiliary to it, a new company, with the understanding that they or some of them shall become stockholders in it, and then that valuable con-tracts shall be given to it by the railroad company, in the profits of which they, as such stockholders, shall share.[1] It is sufficient ground for equitable in-terference, at the suit of a stockholder of a corporation, that the officers thereof, who are members of one family and own a majority of the stock, have com-bined to appropriate the profits of the corporation in the form of salaries, and through a contract with a firm of which they are members, and that they have also combined to keep him in ignorance with regard to these transac-tions.[2] Where a statute authorizes a telegraph company to lease or sell its franchises and property to any other telegraph company, provided the lease or transfer be approved by a three-fifths vote of its board of directors, and also by the consent in writing, or by vote at a general meeting, of three-fifths in interest of the stockholders, a lease of the property and franchises of a tel-egraph company is voidable at the election of the lessor, if at the time the lease was made a majority of the board of directors of the lessor were direct-ors of the lessee also, and the lessee owned nearly two-fifths of the stock of the lessor.[3] A contract between a railroad company and a construction com-pany is void where any of the directors of the former are members of the construction company. Such contract cannot be ratified by a board of direct-ors composed in part of members of the construction company, and mere knowledge and inaction on the part of the stockholders for a time will not estop them from resisting the enforcement of the contract.[4] But a recovery may be had to the extent the railroad company was actually benefited by the work done under such contract, on the basis of a *quantum meruit*.[5] If a contract made by a director with the corporation is to be construed so as to involve the granting to him of enormous commissions, without regard to the debts of the corporation, it is unreasonable, as injuriously affecting the rights of the stockholders, and is beyond the power of the directors to make with their co-directors. A contract which provides that one is to be elected a di-rector, and invests him with power as though already a director, must be construed as if he was a director when it was made.[6] Where defendant and other directors of a corporation levied an assessment upon its stock, upon which but a small per cent. had been paid, and threatened further assess-ments for the purposes of the corporation, whereby plaintiff was induced to sell and transfer his stock, held, that such sale was not so tainted with fraud as to render it void.[7]

III. NATURE OF ADVERSE INTEREST NECESSARY TO RENDER CONTRACT INVALID. In *Hallam* v. *Indianola Hotel Co.*[8] the supreme court of Iowa held that there is no objection to a director of a corporation becoming its creditor, or to his taking security for his debt, but his conduct in enforcing his claim will be more closely scrutinized than that of an ordinary creditor, and proceedings for such enforcement will be set aside if it appears he has not acted in good faith as director. It appeared in that case that Perry &

[1] Wardell v. Union Pac. R. Co. 103 U. S. 651, (S. C. 12 Cent. Law J. 559,) affirming 4 Dill. 330; Thomas v. Railroad Co. 109 U. S. 522; S. C. 3 Sup. Ct. Rep. 315; Meeker v. Winthrop Iron Co. 17 Fed. Rep. 48, and note by Francis Wharton.

[2] Sellers v. Phœnix Iron Co. 13 Fed. Rep. 20.

[3] Bill v. Western Union Tel. Co. 16 Fed. Rep. 14.

[4] Thomas v. Brownville, etc., Ry. Co. 2 Fed. Rep. 877; affirmed, Thomas v. Brown-

ville, etc., R. Co. 109 U. S. 522; S. C. 3 Sup. Ct. Rep. 315.

[5] Thomas v. Brownville, etc. Ry. Co. 109 U. S. 522; S. C. 3 Sup. Ct. Rep. 315; re-versing upon that point the same case, 2 Fed. Rep. 877.

[6] Hubbard v. N. Y., etc., Investment Co. 14 Fed. Rep. 675.

[7] Grant v. Attrill, 11 Fed. Rep. 469. See 19 Amer. Law Rev. 919.

[8] 9 N. W. Rep. 111; 12 Reporter, 361; 21 Amer. Law Reg. (N. S.) 443, and note by Mr. Adelbert Hamilton.

Lucas obtained a decree of foreclosure upon the property of the hotel company. The property was sold upon execution, and purchased by Perry, who was one of the directors of the hotel company, for a little over $4,000. It cost $19,000, and in the opinion of the court was worth $10,000. ADAMS, C. J., said: "That it [the property] was allowed to be sold upon execution, and was not redeemed, nor the right of redemption sold, but a sheriff's deed allowed to issue, while not sufficient to establish fraud, is sufficient to excite suspicion, and give some support to the claim strenuously insisted upon by the plaintiffs, and of which we think that there was some slight evidence, at least, that there was concert of action between Perry and the other officers of the company looking to the attainment of the result which has been reached. Now, Perry was charged with the duty, as much as any other director was, of making a reasonable effort to prevent this result. It follows that, our minds being affected with suspicion that such effort was not made, * * * we think that the sale should be set aside." The president of a corporation occupies a position of trust, and may be called upon in equity to account for and make restitution of any part of the property confided to his care, which he has improperly applied to his own use. While a contract by which a corporation delivers to its president, with power of sale, unissued stock, as security for a loan from him, will be looked upon with suspicion, it will be enforced when shown to have been made for the benefit of the corporation, and to be just. And an order was entered permitting a sale of sufficient of such stock to satisfy the amount actually loaned by the president, unless that amount was paid to him.[1] If a director of a railroad corporation enters into a contract for the construction of the road of his corporation, he cannot then, nor subsequently, personally derive any benefit from such contract.[2] A corporation which has resolved to borrow money to pay its debts is not bound by a mortgage executed by its president to a firm of which he was a member, to secure debts he had purchased and assigned to the firm.[3] A note was made by the directors of one corporation, as individuals, and transferred to another corporation, one of the makers being payee and indorser and president of both corporations. Held, that he could not consent for the creditors (the corporation holding the note) to any arrangement releasing or impairing the individual liability of himself or his co-directors.[4] A director of a bank loaned the moneys of the bank on a note running to the bank at a stipulated rate of interest, but upon a secret agreement with the borrowers that he should participate in the profits of lands to be purchased with the moneys. Held, that he was bound to surrender those acquired profits to the bank.[5] Where one of the sureties on an official bond given by a city officer, was also mayor of the city, who had concurrent power with the recorder to approve such bonds, the fact that he was a party to the bond would preclude him from acting officially in regard to it; and his knowledge of a fact tending to invalidate it could not bind the city. He could not act at the same time in a public and private capacity, and in antagonistic interests.[6] As to when notice to an officer is notice to the corporatian, see *Waynesville Nat. Bank* y. *Irons.*[7] The knowledge that a cashier was acting for himself as well as for the bank in issuing a certificate of stock, put the person dealing with such cashier upon inquiry as to his authority and good faith; and, having failed to make it, the bank is not liable upon the certificate.[8]

[1] Combination Trust Co. v. Weed, 2 Fed. Rep. 24.
[2] European Ry. Co. v. Poor, 59 Me. 277.
[3] Davis v. Rock Creek, etc., Co. 55 Cal. 359; S. C. 36 Amer. Rep. 40.
[4] Gallery v. Nat. Ex. Bank, 41 Mich. 169; 36 Amer. Rep. 149.

[5] Farmers' & Merchants' Bank v. Downey, 53 Cal. 466; S. C. 31 Amer. Rep. 62.
[6] Stevenson v. Bay City, 26 Mich. 44.
[7] 8 Fed. Rep. 1, and note, in which the authorities are fully collected and considered.
[8] Moores v. Citizens' Nat. Bank, 15 Fed. Rep. 141. See same case in 4 Sup. Ct. Rep.

IV. UNDER WHAT CIRCUMSTANCES AN OFFICER MAY ACQUIRE AN INTER-
EST ADVERSE TO THE CORPORATION. The case of the *Twin Lick Oil Co.* v.
*Marbury*[1] contains an excellent statement of the circumstances under which
an officer may acquire an interest adverse to the corporation. The supreme
court there held that a director of a corporation is not prohibited from lend-
ing it moneys when they are needed for its benefit, and the transaction is
open and otherwise free from blame; nor is his subsequent purchase of its
property, at a fair public sale by a trustee, under a deed of trust executed to
secure the payment of them, invalid. The right of a corporation to avoid the
sale of its property by reason of the fiduciary relations of the purchaser, must
be exercised within a reasonable time after the facts connected therewith are
made known, or can, by due diligence, be ascertained. As the courts have
never prescribed a specific period as applicable to every case, like the statute
of limitations, the determination as to what constitutes a reasonable time in
any particular case must be arrived at by a consideration of all the elements
which affect that question. The property in controversy in the present suit
had been appropriated and used for the production of mineral oil from wells,
—a species of property which is, more than any other, subject to rapid, fre-
quent, and extreme fluctuations in value. The director who bought it com-
mitted no actual fraud, and the corporators knew at the time of his purchase
all the facts upon which their right to avoid it depended. They refused to
join him in it, or to pay assessments when made on their stock; and it was
nearly four years thereafter, when the hazard was over, and his skill, energy,
and money had made his investment profitable, that any claim to or assertion
of right in the property was made by the corporation or the stockholders.
Held, that the court below properly dismissed the bill of complaint of the
corporation, praying that the purchaser should be decreed to hold as its trus-
tee, and to account for the profits during the time he had the property.

V. DIRECTORS OCCUPY CONFIDENTIAL RELATIONS ALSO TO CREDITORS
OF CORPORATION. The directors of a corporation stand in confidential rela-
tions to its creditors, towards whom they are bound to act with perfect fair-
ness. They are, at least, *quasi* trustees for the creditors, and where the cor-
poration is insolvent, good faith forbids that the directors should use their
position to save themselves, or one of their number, at the expense of other
creditors. Where the board of directors of an insolvent corporation confessed
a judgment against the corporation in favor of one of their number, who was
also president of the corporation and principal stockholder, with a view of
giving him priority of lien over another creditor, who was about to obtain a
judgment in a judicial proceeding, held, that such preference could not be up-
held, but that the two judgments must stand on a footing of equality in re-
spect to the commencement of the lien, and share *pro rata* in the proceeds of
the property available for their payment.[2]

VI. EFFECT OF A MINORITY ONLY OF THE DIRECTORS BEING INTER-
ESTED. In the case of the *U. S. Rolling Stock Co.* v. *A. & G. W. R. Co.*[3] a con-
tract was made by which the plaintiff was to furnish the defendant the roll-
ing stock needed by it for seven years, at a fixed rental. At the time the
contract was entered into and confirmed by defendant's board of directors,
and for some two years afterwards, five of defendant's board of thirteen di-
rectors were the sole members of plaintiff's board of directors. It was claimed
also by the plaintiff that the contract had been ratified by the subsequent ac-
tion of defendant's officers and agents. The court held that "a contract

345, where the judgment of the court below
was affirmed.

[1] 91 U. S. 587.

[2] Coons v. Tome, 9 Fed. Rep. 532. See

also, Thompson, Liability of Officers, etc.,
p. 397, § 24 et seq.; Goodin v. Canal Co. 18
Ohio St. 169.

[3] 34 Ohio St. 450.

made between two corporations, through their respective boards of directors, is not voidable at the election of one of the parties thereto from the mere circumstance that a minority of its board of directors are also directors of the other company." BOYNTON, J., said: "If it be granted that the confirmation of the contract by the defendant's board of directors at the meeting of August 2, 1872, was voidable in equity, at the election of the company, for want of the presence at that meeting of the board of a quorum of directors who were not directors of the plaintiff, it nevertheless appears that the board was composed of 13 persons, a clear majority of whom were affected with no incapacity to act for the best interests of the company, and who sustained no fiduciary relation to the plaintiff whatever. This majority possessed ample power to restrain and control the action of the minority; and if the contract was voidable at the option of the company, it had full power to express the company's election if it saw fit to avoid the contract. The fact that some of the persons composing this majority might vote with those who were members of both boards, and thereby create a majority in favor of the contract, would in nowise affect the validity of the transaction, nor relieve the board from the duty to move in the matter, if they desired the company's escape from liability. We have not, upon the most diligent research, been able to find a case holding a contract made between two corporations by their respective boards of directors invalid or voidable, at the election of one of the parties thereto, from the mere circumstance that a minority of its board of directors are also directors of the other company. Nor do we think such a rule ought to be adopted. There is no just reason, where a quorum of directors, sustaining no relation of trust or duty to the other corporation, are present, participating in the action of the board, why such action should not be binding upon the company, in the absence of such fraud as would lead a court of equity to undo or set aside the transaction. If the mere fact that a minority of one board are members of the other gives the company an option to avoid the contract, without respect to its fairness, the same result would follow where such minority consisted of but one person, and notwithstanding the board might consist of 20 or more. In our judgment, where a majority of the board are not adversely interested, and have no adverse employment, the right to avoid the contract or transaction does not exist without proof of fraud or unfairness, and hence the fact that five of the defendant's board of directors were members of the plaintiff's board, whatever may have been its effect on the defendant's right to disaffirm or repudiate the contract, if exercised within a reasonable time, did not disable the defendant from subsequently affirming the contract, if satisfied with its terms, or rejecting it if not; nor did it relieve it from the duty to exercise its election to avoid or rescind within a reasonable time, if not willing to abide by its terms." [1]

It may be questioned, from the authorities heretofore referred to, and the general tendency of decisions upon the relations of directors and other officers to the stockholders and creditors, whether the foregoing will be accepted as the correct view of the effect of the presence of an adversely interested minority. It is respectfully suggested that the stockholders and creditors contracted for a full board of impartial, disinterested directors. Judge WELCH well said, in the *Goodin Case*,[2] "a director whose personal interests are adverse to those of the corporation has no right to be or act as a director. As soon as he finds that he has personal interests in conflict with those of the company, he ought to resign." The doctrine advanced by Judge BOYNTON, on the other hand, not only deprives them of a full board of such men, but saddles upon

---

[1] Pages 465, 467. See, also, Morawetz Priv. Corp. § 245, note 3, and cases cited;   Flagg v. Manhattan Ry. Co. 10 Fed. Rep. 413, 433; Harts v. Brown, 77 Ill. 226.
[2] 18 Ohio St. 183.

them an interested minority, with all the vantage ground possessed through the confidence of and influence with their fellow-members which such directors may have acquired by their association together in such relation. In the *Rolling Stock Co. Case*, for instance, instead of that company being compelled to influence the votes of seven members of the board, as would have been the case had all the directors of the railroad company been impartial, it was necessary for them to secure only two more in addition to those who composed the board of the rolling stock company. If the question is to turn upon the unfairness of the contract, it is believed that as to many exceedingly prejudicial contracts it will be almost impossible for those objecting to show them to be such. "Besides," as said by Judge McCRARY,[1] "where shall we draw the lines? If the presence of two interested directors in the board at the time of the ratification does not vitiate the act, would the presence of a larger number of such directors have that effect, and, if so, what number?"[2]

VII. DIRECTORS PERSONALLY LIABLE. Directors are personally responsible for frauds and losses resulting from gross negligence and inattention to the duties of their trust.[3] The opinion of Judge HUGHES, in *Trustees* v. *Bosseieux*, is an exhaustive examination of the question. *Ackerman* v. *Halsey* grows out of the celebrated Mechanics' National Bank of Newark, New Jersey, failure, caused by Baldwin, its cashier, embezzling over $2,000,000 of the bank's funds. The chancellor there, upon demurrer, sustained a bill filed by a creditor and stockholder against the president and directors, alleging gross neglect of duty and mismanagement in permitting such loss, where reasonable care would have prevented it. He held that the directors are bound to use reasonable diligence, such as men usually exercise in their own affairs of a similar nature. The bill must be for the benefit of all stockholders and creditors. As to liability for fraudulent issue of stock, see *Langdon* v. *Fogg*.[4]

VIII. LIMITATIONS UPON POWER OF MAJORITY OF STOCKHOLDERS. The holders of a majority of the stock of a corporation may legally control the company's business, prescribe its general policy, make themselves its agents, and take reasonable compensation for their services. But, in thus assuming the control, they also take upon themselves the correlative duty of diligence and good faith. They cannot lawfully manipulate the company's business in their own interests to the injury of other stockholders. They cannot by their votes in a stockholders' meeting lawfully authorize its officers to lease its property to themselves, or to another corporation formed for the purpose and exclusively owned by them, unless such lease is made in good faith and is supported by an adequate consideration; and, in a suit properly prosecuted to set aside such a contract, the burden of proof, showing fairness and adequacy, is upon the party or parties claiming thereunder. All doubts will be solved in favor of the corporation for whom such stockholders assumed to act.[5]

IX. STOCKHOLDERS IMPEACHING ACTION OF DIRECTORS—PREREQUISITES. A stockholder in a corporation cannot set aside the transactions of its directors unless he held his interest at the time of the proceeding complained of, nor unless he has exhausted all the means within his reach to obtain redress without resort to a court of law.[6] He must make every reasonable effort to get the proper officers of the corporation to take action, before he will be per-

---

[1] Thomas v. Ry. Co. 2 Fed. Rep. 879.
[2] See same case, 109 U. S. 522. S. C. 3 Sup. Ct. Rep. 315, where the holding of Judge McCrary as to the voidability of the contract was affirmed.
[3] Trustees v. Bosseieux, 3 Fed. Rep. 817;

Ackerman v. Halsey, 17 Cent. Law J. 433, (N. J. Ch. Ct.)
[4] 18 Fed. Rep. 5.
[5] Meeker v. Winthrop Iron Co. 17 Fed. Rep. 48, and note by Francis Wharton.
[6] Dimpfel v. Ohio & M. Ry. Co. 3 Sup. Ct. Rep. 573; 110 U. S. 209.

mitted to sue in behalf the corporation himself.[1] In *Hawes* v. *Oakland*[2] the supreme court of the United States held that, in order to entitle a stockholder to sue in behalf of the corporation, there must be shown: "(1) Some action or threatened action of the directors or trustees which is beyond the authority conferred by the charter or the law under which the company was organized; or (2) such a fraudulent transaction, completed or threatened by them, either among themselves or with some other party, or with shareholders, as will result in serious injury to the company or the other shareholders; or (3) that the directors, or a majority of them, are acting for their own interests in a manner destructive of the company, or the rights of the other shareholders; or (4) that the majority of the shareholders are oppressively and illegally pursuing, in the name of the company, a course in violation of the rights of the other shareholders which can only be restrained by a court of equity; (5) it must also be made to appear that the complainant made an earnest effort to obtain redress at the hands of the directors and shareholders of the corporation, and that the ownership of the stock was vested in him at the time of the transactions of which he complains, or was thereafter transferred to him by operation of law."

X. DEMAND UPON DIRECTORS TO SUE, BEFORE STOCKHOLDER CAN DO SO, NOT NECESSARY, WHEN. "If the agents of the corporation, in whom the authority to direct its litigation is vested, are themselves guilty of a wrong against the corporation, a court of equity will interfere at the suit of a stockholder to protect his interest in the corporation, without requiring him first to request the guilty agents to proceed in the name of the corporation against themselves."[3]

XI. COMPENSATION OF OFFICERS. When an officer of a corporation performs the usual and ordinary duties of his office, as defined by the charter and by-laws, he cannot recover any compensation therefor unless it has been so specially agreed.[4] And a subsequent vote of the board of directors to pay a director or other officer for his services, when there was no previous agreement, is not binding.[5] In *Loan Association* v. *Steinmetz*,[6] defendant, a director, was chairman of committee on short loans. His duties were quite burdensome. No salary had been agreed upon, but after he had held the position a year and a half the board of directors voted him a salary of $200 a year, and ordered him paid $300 back salary, for which an order was issued to him. He brought suit upon it, and recovered judgment in the lower court, but the supreme court, in reversing it, said: "We regard it as contrary to all sound policy to allow a director of a corporation, elected to serve without compensation, to recover payment for services performed in that capacity, or as incidental to his office. It would be a sad spectacle to see the managers of any corporation, ecclesiastical or lay, civil or eleemosynary, assembling together and parceling out among themselves the obligations or other property of the corporation in payment for their past services. The expectation of a director that he was to receive compensation, there being no

---

[1] Memphis City v. Dean, 8 Wall. 73; Cook v. Berlin Mills Co. 6 Reporter, 188; Davenport v. Dows, 18 Wall. 626; Taylor v. Holmes, 14 Fed. Rep. 498; Detroit v. Dean, 106 U. S. 537; S. C. 1 Sup. Ct. Rep. 560; Bissit v. Ky. Riv. Nav. Co. 15 Fed. Rep. 361, note.

[2] 104 U. S. 450; S. C. 21 Amer. Law Reg. (N. S.) 252; 14 Cent. Law J. 288.

[3] Morawetz, Priv. Corp. § 386, and cases cited. See, also, note to Bissit v. Ky. Riv. Nav. Co. 15 Fed. Rep. 353, 361.

[4] Citizens' Nat. Bank v. Elliott, 7 N. W.

Rep. 506; S. C. 55 Iowa, 104; 39 Amer. Rep. 167; Austin City R. Co. v. Swisher, 15 Reporter, 760, (Tex. Ct. App.)

[5] Pierce, R. R. 31; Loan Ass'n v. Stonemetz, 29 Pa. St. 534; Kilpatrick v. Bridge Co. 49 Pa. St. 118; Dunston v. Gas Co. 3 B. & A. 125; Holder v. L., etc., Co. 71 Ill. 106; Maux Ferry Gravel Co. v. Branegan, 40 Ind. 361; N. Y., etc., R. Co. v. Ketchum, 27 Conn. 170; Austin City R. Co. v. Swisher, supra. And see cases collected in Pierce, R. R. 31, and notes.

[6] Supra.

previous vote or promise, does not entitle him to it. The rule which excludes compensation applies to the president chosen by the directors from their own number, and also to a treasurer when a director." The supreme court of Kansas, in a late case, after an exhaustive examination of the question, conclude: "We do not agree with all the authorities heretofore cited as to the lack of power on the part of the directors to appropriate money in payment of the salary of the cashier or other officer after the services have been rendered, and in cases when such cashier or other officer happens to be a director. We think the rule is, in the absence of positive restrictions, that, when no salary is prescribed, one appointed to an executive office, like that of cashier, is entitled to reasonable compensation for his services, and that the directors have power to fix the salary after the expiration of the term of office, and this, though such appointee is also a director, and continues to be such while holding the independent office."

For *extra services* an officer receiving a salary is not entitled to compensation, unless there was an express agreement, or such circumstances as to raise a presumption, that the parties intended them to be paid for; and the mere fact that the services were rendered would not raise such presumption.[1] In *Santa, etc., Ass'n* v. *Meredith*,[2] on the contrary, the doctrine seems to be announced that in the absence of circumstances indicating a different understanding, merely rendering the services would raise an implied contract for compensation whenever that result would follow between private individuals.

*Cincinnati, May,* 1884.　　　　　　　　　　　　　　　　J. C. HARPER.

[1] Pew v. First Nat. Bank of Gloucester, 130 Mass. 391.　　　　[2] 49 Md. 389; S. C. 33 Amer. Rep. 264.